# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF LLINOIS
# EASTERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

JOSEPH JONES,

        Defendant.

No. 17 CR 236

Judge Andrea Wood

## DEFENDANT JOSEPH JONES' MOTION FOR JUDGMENT OF AQUITTAL OR NEW TRIAL

Defendant **JOSEPH JONES,** by his undersigned attorneys, **PATRICK E. BOYLE** and **JAMES VANZANT,** respectfully moves under Rules 29 and 33 of the Federal Rules of Criminal Procedure[1] for judgments of acquittal as to Counts One and Two, or, in the alternative, for a new trial.

### I. A new trial must be granted based on newly discovered evidence.

The government deliberately withheld a $50,000 payment to the only testifying CHS until a week after the verdict so that the existence of this payment could not be considered by the jury. Were this information available to defense counsel before trial, Defendants could have argued that the testimony of Muhamed should be disregarded in its entirety. Now, because of the government's strategic decision, we can only speculate as to how knowledge of this payment would have affected the jury's verdict.

---

[1] In the event this Court concludes that the appropriate remedy for the issues raised is an Arrest of Judgment under Rule 34, this Motion is also brought pursuant to that Rule.

To obtain a new trial based on newly discovered evidence, a party must show that the evidence (1) was discovered after trial; (2) could not have been discovered sooner had due diligence been exercised; (3) is material and not merely impeaching or cumulative; and (4) would probably lead to acquittal in the event of a new trial. *See, e.g.*, *United States v. O'Malley*, 833 F.3d 810, 813 (7th Cir. 2016); *United States v. Hagler*, 700 F.3d 1091, 1101 (7th Cir. 2012); *United States v. Reyes*, 542 F.3d 588, 595 (7th Cir. 2008); *United States v. Brumley*, 217 F.3d 905, 909 (7th Cir. 2000). Regarding the first and second prongs, there can be no question that the $50,000 payment as well as the circumstances surrounding it were discovered after trial and could not have been discovered sooner had due diligence been exercised.

For the third prong, although aspects of this new evidence might be considered as impeachment, it can hardly be considered "*merely* impeaching." At the December 2019 hearing, even Carnright admitted that if that $50,000 had been made prior to trial, a defense attorney would have been entitled to that in payment formation and would be allowed to cross-examine the cooperator on that information. Hearing Tr. 31:17-21.[2] In this respect alone, it is difficult to imagine that the existence of a $50,000 payment to Muhamed could not be material.

More importantly, the evidence directly contradicts the government's narrative throughout trial that Muhamed only acted as a CHS out of zeal for his new homeland. At trial, both he and his handler, FBI Special Agent Carnright, testified that he was voluntarily cooperating with the FBI, that he only received

---

[2] The Trial Transcript is cited as "Tr." followed by the page number. The transcript of the December 2, 2019 hearing before this court is cited as "Hearing Tr." followed by the page number. The electronic record is cited as "Dkt." followed by the document number.

reimbursement for specific expenses, that he never requested payment for his work, and that he was never promised anything beyond reimbursement of expenses. In particular, Agent Carnright stressed that Muhamed was "voluntarily assisting the FBI" (Tr. 252), was "a very patriotic individual, very law-enforcement friendly, and [had] a very positive work experience with the [Department of Defense] overseas" (Tr. 405). During his testimony, Muhamed also stressed the voluntary nature of his work for the FBI, his support for law enforcement generally, and his family's previous work for law enforcement. (Tr. 1223-1225, 1426, 1436, 1439-40, 1501, 1503).

Both Agent Carnright and Muhamed minimized the nature of any benefits he had received in return for his work for the FBI. Carnright testified that any payments to Muhamed were reimbursement for expenses, for a "junker" of a car, and for his relocation after Defendants were arrested and charged. Tr. 410-412, 412. According to both, Muhamed received no more than approximately $16,000 for these incidental costs. Tr. 412. Muhamed stressed that he was not receiving a salary from the FBI (Tr. 1504) and that this compensation covered "money only for fuel, car . . . not fancy car, just cheap car— for parking, for moving out from my old apartment after the case." Tr. 1226. On direct, Muhamed could not have been more categorical in his denial of any material compensation:

Q: Did you ask the FBI for anything in exchange for your cooperation with them?
MUHAMED: No.
Q: Did they offer you anything in exchange for your cooperation with them?
MUHAMED: No.
Q: Did you expect to get anything?

MUHAMED: No.

Tr. 1225:7-14.

During closing argument, the government drove this point home: "The FBI didn't promise him anything. He didn't ask anything from them. In fact, the only thing he got from them was reimbursement of funds that he had to spend for the investigation." Tr. 2737:12-15. Similarly, during the jury instruction conference, while arguing against the Defendants' proposed "caution and great care" instruction, the government argued, "Typically when the caution and great care instruction is given it's because it's very obvious the person has got a plea deal or something like that. [...] I think in light of the very minimal benefit, if any, and the dispute as to whether there is a benefit or not, this particular witness does not warrant an instruction so strong as the caution and great care instruction." Tr. 2272:23 to 2273:9. The Court was persuaded by this argument and declined to give the instruction, finding that "a special cautionary statement, I do think, is reserved for those situations where there is a concrete benefit, such as a plea, cooperation credit, or something else that very clearly or at least as has been presented is evidence of a benefit. It does not strike me as necessary here." Tr. 2451:20-24.

It turns out that there *was* a significant benefit planned. In her affidavit, Agent Carnright testified that "prior to trial" there was a "conversation about the possibility of paying Muhamed" with members of the United States Attorney's Office. Dkt. 135, ¶4. In response, the U.S. Attorney's Office advised her to "wait until after the resolution of the case" to pay Muhamed. *Id.* Carnright stressed, however, that her "intention to pay Muhamed was notional until officially requested

and concurred upon by FBI Management" on June 26, 2019. *Id.* This is nonsense. Both the FBI and the prosecution knew that Muhamed would receive his substantial bonus. Their decision to delay it until after the Defendants' arrests, trial and convictions, was purely cynical and strategic. There was nothing "notional" about it.

But the $50,000 payment was not the only post-trial revelation. At hearing, Carnright's testimony cast her entire relationship with Muhamed in a completely different light. At hearing, Carnright testified that throughout their relationship, Muhamed would discuss his financial concerns, often at her request. Hearing Tr. 38:19-23. In her affidavit, Carnright claimed that the $3,000 advance on June 28, 2019, was "specific to Muhamed's financial need at the time." Dkt. 235, ¶6. At hearing, Carnright explained that the situation was more dire: "He had no money. He had lost the job that he currently had during trial. And because we were going to pay him but it would take a substantial amount of time more to get the full amount, I requested we advance him some of the money to cover his rent and food expenses." Hearing Tr. 43. It is significant that Muhamed's financial situation was so precarious that losing his job at some point during trial resulted in his having no money less than a week after it concluded. Even more, according to Carnright, she was monitoring his finances so closely that she knew how important it would be to provide him with the $3,000 just over a week after the trial concluded.

Yet, at hearing, Carnright insisted that at no point did she indicate to Muhamed that she intended to make any payment—let alone $50,000—to him until she provided this advance on June 28, 2019. Nor, she claimed, had Muhamed ever

requested further payment. This is the hill the government refuses to abandon. For if Muhamed expected payment—or even understood that he might receive additional payment as a result of his testimony—then there can be no question that the jury might have disbelieved the testimony of Muhamed and Carnright at trial. And so, at hearing, Carnright stressed that she never promised Muhamed additional funds and that the first time Muhamed learned that he would be receiving an extra payment for his work in this case was on the day that she paid him, June 28, 2019.

These claims defy common sense. If Carnright is to be believed, Muhamed went for long periods without salary during the investigation, and when he did have a salary, Carnright did not know what it was. At some point before the close of that investigation, Carnright discussed the prospect of paying Muhamed additional money with AUSA Jonas, who instructed her to wait until after trial. During trial Muhamed lost his job. Yet somehow, without his alerting her to his financial condition or requesting that he be compensated further at all, Carnright divined that Muhamed's need was so great that she not only expedited a request for $50,000 *within six days* of the jury's verdict on June 20, but she also had the foresight to bring $3,000 in cash to her meeting with Muhamed on June 28, the first time she told him the good news that he would be receiving a $50,000 bonus for his service. In her post-trial testimony, Carnright went even further and claimed that Muhamed refused the money at first, only to eventually acquiesce to the lump sum of $50,000. The timing and logistics of Carnright's explanation are incredible. Even more, they are relevant to Muhamed's testimony regarding the nature of his

interactions with the government and the Defendants in the present case. Even later-occurring events may give an insight into the character of the relationship between the prosecutorial team and their witnesses. *See, e.g., United States v. Boyd*, 55 F.3d 239, 245 (7th Cir. 1995); *Fields v. City of Chicago*, 2015 U.S. Dist. LEXIS 189573, *29-31 (N.D. Ill. Apr. 6, 2015).

Armed with this evidence, defense counsel could have argued that Muhamed's testimony regarding his conversations with Defendants should be disregarded in their entirety. As the only CHS to testify, Muhamed's testimony was essential to the government's case as well as its rebuttal against Defendants' entrapment defense. *See, e.g.*, Tr. 2725:2-12 (Government's closing argument, regarding predisposition: "But [Defendants] still wanted to support ISIS. And Muhamed was the perfect opportunity to do so."). At trial, Muhamed described efforts he made to comply with Carnright's instructions to avoid injecting certain topics into conversations with Defendants, presumably to avoid the appearance of government inducement. Many of these conversations were not recorded, and so both his and Carnright's credibility on these issues were crucial to the entrapment issue. Futher, the December 2, 2019 hearing was not the first time that Carnright was called back to testify regarding the late disclosure of evidence that raised questions regarding the extent and scope of the government's efforts behind the scenes in this case. At trial, she was recalled due to the government's late disclosure of evidence relevant to the entrapment issue.

At the December 2, 2019 hearing, inconsistencies in Carnright's testimony cast even greater doubt onto the accuracy and truthfulness of her testimony at trial.

Again, these inconsistencies are not *merely* impeachment; they are evidence tending to weigh on the propriety of an investigation that went to great lengths to induce Defendants to join in a criminal venture concocted by the FBI. For example, at trial, Carnright testified that the money paid to Muhamed was only "for some expenses"—namely, "a car to drive up north to meet [Defendants]" and to pay "for him to relocate from his home." Tr. 411:1-11. Muhamed's testimony appeared to corroborate this: "They give money only for fuel, car—I mean not fancy car, just cheap car—for parking, for moving out from my old apartment after the case." Tr. 1226:6-8. Both Muhamed and Carnright stressed that he was not earning a salary and that he was not an employee of the FBI. Tr. 403:12-13 (Carnright); Tr. 1504:22-25 to 1505:2 (Muhamed testifying that he was not earning a salary and was not an employee). Yet at the December 2, 2019 hearing, Carnright revealed that by "relocation expenses" she was not referring to the costs of relocating *per se*—i.e., movers and transport; instead, the FBI "subsidized the need for him to relocate with no finances," including paying the rent and electricity for his new apartment. Hearing Tr. 17:5-21. Elsewhere, Carnright characterized these payments not as a per diem, but as a "stipend to relocate . . . for a very specific purpose." Hearing Tr. 25:8-10.

But even here, regarding the purpose of this $8,680 stipend, Carnright contradicted herself while testifying before this Court. At hearing, Carnright produced a spreadsheet itemizing the dates and amounts of the expenses paid to Muhamed. *See* Exhibit 1 ("Copy of Expense Tracker"). This list reflects a September 12, 2016, payment of $1,600 to Muhamed. *Id*. At hearing, Carnright explained that

this $1,600 was for the down payment of the car that Muhamed bought to use during the course of the investigation. Hearing Tr. 15:7-10; 16:2-5. Thus, the purpose of this $1,600 payment was separate from that of the $8,680 stipend, also logged on Carnright's "Expense Tracker." At hearing, however, Carnright had difficulty recalling the specific breakdown of the $8,680 (Hearing Tr. 29:7-10); still, she testified that this lump sum "encompasses all of the expenses" that were part of his "stipend for relocation," and she assured defense counsel that she would provide the breakdown of the $8,680 sum when she could. Hearing Tr. 26:21 to 27:4.

Indeed, this "breakdown" later provided by Carnright includes more specifics regarding the $8,680 relocation stipend. *See* Exhibit 2. But the specifics directly contradict Carnright's testimony at the December 2 hearing. In particular, the breakdown reflects a "Car Down Payment" of $1,500 and a sum of $1,200 for three months of "Car Payment Appx." *Id.* Yet at hearing, Carnright testified that the car down payment and monthly payments were reflected in the "Expense Tracker" entries for the $1,600 paid on September 12, 2016—over six months before the $8,680 relocation stipend was paid. This is no minor discrepancy. This shows that Carnright has repeatedly failed to provide a truthful accounting of the money that was paid to Muhamed and the nature of his relationship to the investigation.

If there is any truth to the documents provided by Carnright during and after the December 2019 hearing, then Carnright's and Muhamed's testimony at trial regarding the nature of the payments was misleading, if not false. At trial, Carnright testified that "all the money provided to Muhamed was to afford for any costs incurred to him throughout the course of the investigation." Tr. 411. Put

another way, she "didn't want to put him in the hole for the work that we asked him to do." *Id.* During the trial, the government led us to believe that the sum total of those expenses came to about $16,000. After trial, in her sworn affidavit, Carnright again stated that the $16,000 in payments were "exact reimbursement for expenses incurred at the request of the FBI as previously disclosed to the Court." Dkt. 235, ¶8. To be sure, this estimate appears to square with the $16,845.88 in pre-trial payments listed in the "Expense Tracker." *See* Exhibit 1. But, according to the "Expense Tracker," $5,575 of these pre-trial payments are not tied to expenses at all. *See id.* Instead, approximately two-thirds of the pre-trial payments ($11,270.88) were for expenses. *See id.* The remaining one-third of the pre-trial payments (the $5,575) is listed under "Amount Service"—the same classification given to the $50,000 bonus awarded to Muhamed "as compensation for the services Muhamed provided the FBI over a three year period." Dkt. 135, ¶3 (Affidavit of Cassandra Carnright). Was one-third of the payments made to Muhamed before trial a bonus for services rendered and not—as he and Carnright testified—a reimbursement for minor expenses? It appears so. Here, again, the government's carefully crafted narrative at trial unravels.

At bottom, it was the government's burden not only to prove the Defendants guilty beyond a reasonable doubt but also to rebut their entrapment defense. This newly discovered evidence and the inconsistences it has revealed upend the case the government presented at trial. The government deliberately withheld a $50,000 payment to the only testifying CHS until a week after the verdict so that the existence of this payment could not be considered by the jury in evaluating the

propriety of the government's investigation or the veracity of its witnesses. Now, the government asks this Court to bless this breathtaking injustice. A the very least, this requires a new trial, and this Court should grant one.

## II. A judgment of acquittal must be entered because the evidence was insufficient to sustain the guilty verdicts.[3]

The Court must enter a judgment of acquittal if, viewing the evidence in the light most favorable to the government, no rational jury could have found the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 307 (1979). The defendant need not establish that no evidence at all supports the conviction, *Id.*; *see also United States v. Rahman*, 35 F.3d 1331, 1337 (7th Cir. 1994); *United States v. Mojica*, 185 F.3d 780, 789 (7th Cir. 1999). This "no evidence" standard was rejected in *Jackson*, where the Supreme Court held that "while a 'mere modicum' of evidence may satisfy a 'no evidence standard . . . it could not by itself rationally support a conviction beyond a reasonable doubt." *Jackson*, 443 U.S. at 320; *Rahman*, 34 F.3d at 1337. Instead, after *Jackson*, the defendant need only show that the evidence cannot support a finding of guilt beyond reasonable doubt. *Id.* Furthermore, circumstantial evidence can only be used to support "reasonable inferences—not speculation and conjecture. *See, e.g., United States v. Beckner*, 134 F.3d 714 (5th Cir. 1998); *Ward v. Lockhart*, 841 F.2d 844, 847-48 (8th Cir. 1988); *United States v. Frol*, 518 F.2d 1134, 1137 (9th Cir. 1975); *United States v.*

---

[3] Defendant Jones moved at the close of the government's case for a judgment of acquittal under Rule 29. Tr. 2042:10-15. The Court reserved ruling on Defendants' Rule 29 motions until after the jury entered its verdict. *See* F. R. Crim. P. 29(b). Defendant Jones now renews his motion under Rule 29(c), which permits this Court to grant a motion for Judgment of Acquittal after discharge of the jury. F. R. Crim. P. 29(c).

*Campbell*, 702 F.2d 262, 267 (D.C. Cir. 1983).

To be sure, the Seventh Circuit has often observed that a defendant seeking a judgment of acquittal faces a "nearly insurmountable hurdle." *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019) (reversing denial of Rule 29 motion) (quoting *United Sates v. Johnson*, 874 F.3d 990, 998 (7th Cir. 2017) (collecting cases)). Even so, it has also held that "the height of the hurdle depends directly on the strength of the government's evidence." *Id.* at 486-97 (quoting *United States v. Jones*, 713 F.3d 336, 339 (7th Cir. 2013)). "Although a jury may infer facts from other facts that are established by inference, each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation." *Id.* at 503 (quoting *Piaskowski v. Bett*, 256 F.3d 687, 693 (7th Cir. 2001). And so, in evaluating a case resting on chains of inference, the judge's role in guarding the requirement of proof is crucial:

> In making this assessment, a judge must take special care to guard against the possibility that a defendant might be found guilty by either speculation or mere association. Circumstantial evidence that leads only to a "strong suspicion that someone is involved in criminal activity is no substitute for proof of guilt beyond a reasonable doubt." [*Piaskowski*, 256 F.3d at 692.] And evidence that calls for inferences that are "motivated or made possible by speculation"—especially inferences "focused on a defendant's presence or association with criminals or their criminal activity"—will fail to carry the government's burden. [*Jones*, 713 F.3d at 347.] It is simply not enough to "fill the evidentiary gaps with inferences of guilt by association or evidence of an individual's mere presence somewhere criminal activity may have occurred." [*Id.* at 352.]

*Garcia*, 919 F.3d at 503.

The Government's burden in this regard extends to its burden in rebutting a defendant's affirmative defenses. Here, where this Court found that Defendants had made their initial showing of evidence from which a reasonable jury could find

entrapment. *See* Dkt. 158 at 1-3. Thus, in addition to the elements of the charged offense, the government was required to prove beyond a reasonable doubt that Defendants were (1) predisposed to commit the charged crime, or (2) that there was no government inducement. *See United States v. Mayfield*, 771 F.3d 417, 443 (7th Cir. 2014); *United States v. Blitch*, 773 F.3d 837, 844 (7th Cir. 2014). The entrapment analysis is not a list of mechanical rules—"[e]ach case, and each entrapment defense, must be judged on its own facts." *United States v. Barta*, 776 F.3d 931, 933 (7th Cir. 2014).

In this case, the government failed to prove with credible and probative evidence that the Defendants were guilty of material support of terrorism. Here, not only the quantum—but also the quality—of the proof was too scant to support the government's rebuttal to the entrapment defense. The government failed to present enough evidence to permit a jury to determine beyond a reasonable doubt that defendants were predisposed to commit the charged crime nor that there was no government inducement. At its core, the government's case—in particular, their case in rebutting the entrapment defense—was based on a chain of inferences that was not "sufficiently strong to avoid a lapse into speculation." *Garcia*, 919 F.3d at 503.

A. *The government's evidence cannot prove beyond a reasonable doubt that Defendants were predisposed to commit the charged crime.*

A defendant is predisposed to commit the charged crime "if he was ready and willing to do so and likely would have committed it without the government's intervention, or actively wanted to but hadn't yet found the means." *United states v. Mayfield*, 771 F.3d 417, 438 (7th Cir. 2014); *see also Jacobson v. United States*, 503

U.S. 540, 553-54 (1992 (entrapment is "the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law."). "Importantly, predisposition is measured *prior* to the government's attempts to persuade the defendant to commit the crime." *Mayfield*, 771 F.3d at 436 (citing *United States v. Theodosopoulos*, 48 F. 3d 1438, 144 (7th Cir. 1995) (explaining that a predisposed defendant is one who "was disposed to commit the crime prior to being approached by government agents.")); *See also*, *United States v. Kaminski*, 703 F.2d 1004, 1008 (7th Cir. 1983) ("[P]redisposition is, by definition, the defendant's state of mind and inclinations before *his initial exposure to government agents*.") (internal quotation marks omitted) (emphasis in original).

Factors indicative of predisposition include: (1) the defendant's character and reputation; (2) whether the suggestion of criminal activity was made by the government; (3) whether the defendant engaged in the conduct for profit; (4) whether the defendant exhibited a reluctance to commit the offense, overcome only with repeated inducement or persuasion; and (5) the type of inducement offered by the government. *United States v. Chapman*, 804 F.3d 895, 903 (7th Cir. 2015).

Regarding the first prong, there is no evidence that Mr. Jones had a character or reputation of providing material support to a foreign terrorist organization before the government attempted to radicalize him during their investigation. At trial, Mr. Jones described his conversion to Islam and the philosophical and religious issues that captured his imagination after the Arab Spring. During this time, even while vigorously studying and debating the role that Islam was playing in the political developments in the Middle East, Mr. Jones never expressed a desire to travel

overseas or participate in violence in any way. Prior to the instant case, Mr. Jones had no violent criminal history, nor any history of politically or religiously motivated violence. Testimony at trial showed that Mr. Jones was non-violent, hard-working, studious, and a loving father. *See United States v. Bradfield*, 113 F.3d 515, 523 (5ht Cir. 1991) (testimony from employer that accused was hardworking husband and father supported conclusion that he was not predisposed to commit the crime).

Nor did Mr. Jones make the initial suggestion of criminal activity. As Agent Carnright testified, Case Agent Reeves suggested the idea of providing phones to fighters overseas. Nor is there any evidence that Mr. Jones stood to profit from the crime in question.

With respect to predisposition, "the most important factor is whether the defendant showed reluctance to engage in criminal activity that was overcome by the government's inducement." *United States v. Knope*, 655 F.3d 647, 661 (7th Cir. 2011). Predisposition is not purely a mental state: "[i]t has positional as well as dispositional force." *United States v. Hollingsworth*, 27 F.3d 1196, 1199 (7th Cir. 1994). Put another way, if the defendant was in no position to commit the crime and could not have done so without the government's help, the government has not satisfied the predisposition prong. *Id*. Moreover, predisposition must be measured prior to the defendant's interaction with the government's investigation. *Mayfield*, 771 F. 3d at 436 ("Rational jurors could not say beyond a reasonable doubt that petitioner possessed the requisite predisposition *prior to the government's investigation* and that it existed *independent* of the government's many and varied

approaches to petitioner.") (quoting *Jacobson*, 503 U.S. at 553) (emphasis in original).

Here, Mr. Jones' predisposition, if any, neither occurred prior to nor existed independent of the government's elaborate and extended investigation. Here, as in *Mayfield* and *Jacobson*, law enforcement went too far and "implant[ed] in the mind of an innocent person the *disposition* to commit the alleged offense and induce[d] its commission in order that they may prosecute." *Id.* (quoting *Jacobson*, 503 U.S. at 553). Here, government agents concocted an elaborate ruse—a farce involving the false story of a devout Muslim harassed by police on account of his faith—not merely to befriend Mr. Jones but also to plant a seed of outrage at the injustice and persecution that Muslims suffered, even in a country that purported to champion religious freedom. As discussed below, over the course of nearly two years, law enforcement agents nurtured that seed, repeatedly sending Mr. Jones videos and other propaganda that had been designed to radicalize devout Muslims like Mr. Jones. During that time, law enforcement collected a great deal of evidence showing Mr. Jones' slow transition to the more radical mindset cultivated by law enforcement. As in *Mayfield* and *Jacobson*, none of that evidence is relevant predisposition here.

Even if it were—even if, as a matter of law, the measure of a defendant's predisposition were measured by the defendant's state of mind *after* his initial exposure to government agents—the evidence at trial shows that Mr. Jones resisted the radical and violent philosophy that government agents championed to Mr. Jones throughout the investigation. When agents ask "What's stopping you from going

[overseas to aid terrorist forces]?" Jones answers with uncertainty: "I just feel like am not sure. I need more knowledge and clarity" (Tr. 563:16-19); when agents praise the 2015 terrorist attacks in Paris, Jones is skeptical, but diplomatic: he says, "I'm not condemning. I just want to understand it," (Tr. 564:8-9) and asks agents what they think the Prophet Muhammad's opinion of the attacks would be (Tr. 564:19-24); later, when Mr. Jones is asked his opinion of an undercover agents request that Jones travel to support terrorists, Jones notes that the agent suggestions were illegal and states "We haven't done anything nor plan on being involved in anything. Just trying to be good Muslims and Americans" (Tr. 565:10-12). More significantly, despite continuous pressure from agents that Mr. Jones travel to Syria to support ISIS, he never showed any signs of making an overt act to do so; for example, he never obtained a passport nor made any plans to travel during the several years that he was under government surveillance. Tr. 577:14-22; 529:7 to 530:5.

Finally, the only part of the government's case on this element that relied on *any* evidence of Mr. Jones' state of mind *before* his initial exposure to law enforcement agents, the evidence is insufficient as a matter of law to establish his predisposition. Here, the government's evidence of predisposition was limited to several videos of containing radical Islamic philosophy that was viewed and shared by Mr. Jones sporadically in the years before he first encountered undercover agents. *See, e.g.*, Tr. 2565:12 to 2566:25; 2733:3-9 (At closing argument: "Schimenti and Jones sending those videos to others, posting them on the internet, posting them, positing the Islamic State guide, shows they're predisposed to help ISIS."). Nothing more.

17

*Jacobson* is instructive here. In *Jacobson*, the defendant had previously ordered child pornography from an adult bookstore three months before it was a federal crime to do so. *Jacobson*, 503 U.S. at 542-44. After finding the defendant's name on the bookstore's mailing list, the government repeatedly sent in fake leaflets and other solicitations from fictional organizations promoting the idea that child pornography is acceptable, that efforts to ban it were illegitimate, and offering various items for sale. *Id.* at 543-48. After this campaign continued for more than two years, Jacobson ordered a publication from one of the government's catalogs, and federal agents arrested him. *Id.* The Supreme Court reversed his conviction, holding that the government failed as a matter of law to prove that Jacobson was predisposed to purchase illegal child pornography. *Id.* at 553-54.

Here, as in *Jacobson*, the only pre-investigation evidence of predisposition is that of the legal transfer of material "at most indicative of certain personal inclinations." *Id.* at 551. Evidence of predisposition to do what is lawful is not, by itself, sufficient to show predisposition to do what is illegal, "for there is a common understanding that most people obey the law even when they disapprove of it." *Id.* Even if Mr. Jones were to publicly announce a philosophical affinity for the actions of ISIS abroad, that hardly supports an inference that he would commit a crime. In short, the government's evidence shows that, before his initial exposure to the investigation, Mr. Jones was no more predisposed to provide material support to ISIS than an *Ocean's Eleven* super-fan would be to rob a casino.

Without more, the government has failed to meet its burden here. No rational jury—having properly considered the relevant evidence—could have found that Mr.

Jones was predisposed, independent of the government's acts and beyond a reasonable doubt, to violate the law by providing material support to a foreign terrorist organization.

### B. The government failed to meet its burden of proof on inducement.

Inducement "means government solicitation of the crime *plus* some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts." *Mayfield*, 771 F.3d at 434-35. Government persistence is not enough, by itself, to carry the case beyond an ordinary opportunity—the government must engage in some pressure or coercion. *See United States v. McGill*, 754 F.3d 452, 459 (7th Cir. 2014) ("Government exploitation of friendship can constitute improper inducement."). "Plus factors" indicating inducement may include employing fraudulent representations, promises of reward beyond that inherent in the customary execution of the crime, and pleas based on need, sympathy, or friendship. *United States v. Barta*, 776 F.3d 931, 933 (7th Cir. 2014). In the end, "something more is required, either in terms of the character and degree of the government's persistence or persuasion, or the nature of the enticement or reward." *Mayfield*, 771 F.3d at 433.

Only after the persistent and continuous efforts of law enforcement over nearly two years to influence Mr. Jones did he engage in any act that could be considered criminal. Here, the testimony of Agent Carnright described the initial attempts to contact Mr. Jones online via a CHS. Yet after these repeated attempts over several months received no response from Mr. Jones, FBI, in concert with the Zion Police

19

Department, threatened to arrest Mr. Jones at his place of employment if he refused to go to the Zion Police station for questioning. Once Mr. Jones complied, law enforcement implemented an elaborate ruse designed to gain Mr. Jones' confidence and gradually lure him into participating in a crime he would not otherwise have considered. As Agent Carnright testified at trial, without this ruse, the case would never have taken off.

To that end, on September 1, 2015, Zion police arrived at Mr. Jones' home, picked him up, and brought him to the Zion Police Department. Tr. 533:20-23. There, law enforcement placed an undercover agent, Omar, to appear as a "particularly devout, observant Muslim complaining that he had been racially profiled" resulting in an "unfair traffic stop." Tr. 536:20. Mr. Jones was understandably sympathetic to Omar's fabricated tale, and the two exchanged contact information. Tr. 332:25-333:2.

After this introduction, law enforcement corresponded with Mr. Jones over several months, sharing media that gradually escalated in their radical nature. For example, at first, the videos Mr. Jones sent Omar were innocuous: a video of a speech on Islamophobia given by a Muslim religious leader and another, the subject of which was "Identity." Tr. 551:11 to 552:1. In response, Omar complained about having to deal with the "kuffar/kaffir" (a derogatory term for a non-believer) on a daily basis and sent Mr. Jones a video entitled "Kuffar on Fire." Tr. 554:4-9. Notably, it was Omar, not Mr. Jones, who first introduced to their conversation both the derogatory term, "kuffar," and the notion of violence against nonbelievers. After Omar continued escalating the nature of their exchanges, Jones responded with

videos of a more radical nature; in response, Omar encouraged Mr. Jones' radical turn, saying, "Where do you find those videos? Keep them coming." Tr. 558:13-18. After the November 2015 terrorist attacks in Paris, the two discussed the hardship of being perceived as a threat simply because of their religious affiliation. Tr. 562:21-25. Even after that galvanizing time, after Omar began to broach the subject of traveling to support a foreign terrorist organization, Jones was not clear whether his faith aligned with the radical violence on display in the Paris attacks. "Do you think the prophet approves of the attack?" he asked. Tr. 564:6-7. "I just want to understand it." *Id.* Even here, Omar is clearly the more radical agent, gradually coaxing a now-conflicted and devout Muslim.

After this initial grooming, the FBI bombarded Jones with requests from Omar and other agents who were offering some way for Jones to provide material support to a foreign terrorist organization. On numerous occasions, Omar initiated the discussion of either providing material support or traveling to fight for a foreign terrorist organization. *See* Tr. 566:9-1; 765:6 to 766:13. On other occasions, agents attempted to induce Mr. Jones to attend a weapons training camp. *See*, *e.g.*, Tr. 477:13-22. On another, an agent explicitly offered Jones assistance in travelling to join a foreign terrorist organization. Tr. 577:5-13. Elsewhere, agents suggested that he and Mr. Jones "rock it out"—that is, perform a violent attack in the homeland. Tr. 483:10 to 484:19; 489:15 to 490:1. None of these suggestions were entertained or adopted by Mr. Jones.

After these inducements failed, FBI agents introduced additional "scenarios" in order to "lure Jones into an overt act" as Special Agent Thad Borjete testified. Law

enforcement agents showed Mr. Jones pictures of purported travel to Syria which they claimed was "safe and secure" in order to induce him to travel to join foreign terrorist organizations. They showed Mr. Jones a video of an undercover agent holding an AK-47 rifle and Quran, sitting in front of an ISIS flag, arguing that all Muslims should travel to Syria to fight for ISIS as he did. Agents repeatedly texted Jones to request that he pray and think about making a decision regarding traveling to Syria, to which Jones provided no response. Agents even provided Mr. Jones with a list of items including a cellphone, boots, flashlights, batteries, and band-aids, requesting that he provide these as material support to ISIS.

These refusals in the face of persistent attempts to induce Jones are telling: "[p]ersistence counts as inducement because we worry that if additional efforts at persuasion by the government are required to convince someone to commit a crime, then the result will be the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law." *Barta*, 776 F.3d at 939 (citing *Mayfield*, 771 F.3d at 431); *Jacobson v. United States*, 503 U.S. 540, 553-554 (1992)) (internal quotations omitted). Here, it is difficult to imagine a more persistent effort by law enforcement. Indeed, for much of the investigation, the primary goal of FBI investigators appears to have been to induce Mr. Jones to commit the crime of traveling to Syria to provide material support in the form of his own efforts in waging war on behalf of a foreign terrorist organization. Only after their repeated efforts failed did they attempt to induce him to provide less radical support in the form of phones and other devices. Even then, Jones resisted. In the end, to the extent that Mr. Jones could be said to have provided any material

assistance at all, it is not clear whether he did so to support ISIS, or to put an end to law enforcement's persistent efforts while saving face in front of those who had manipulated him so consistently for years.

## III. Additional Issues

A.     Defendant Jones incorporates herein and expressly reasserts and preserves Defendant Edward Schimenti's *Batson* challenge as laid out in Defendant Schimenti's Consolidated Post-Trial Motions.

B.     Defendant Jones incorporates herein and expressly reasserts and preserves Defendant Schimenti's claims of error regarding the Court's restrictions on Defendants' cross-examination of Undercover Employees, Online Covert Employees, and Confidential Human Sources, as laid out in Defendant Schimenti's Consolidated Post-Trial Motions. By prohibiting Defendants from asking background questions regarding a witnesses identity and employment, from "asking any questions about witnesses' participation in past or pending investigations  or undercover operations," and from "asking any questions regarding any FBI undercover program," the Court impermissibly limited Defendants' Sixth Amendment confrontation right. Nowhere was the effect of this error more apparent than in the post-trial revelation regarding the $50,000 payment to the CHS Muhamed. *See* Part I, *supra*. Without the means to effectively question regarding Muhamed's employment history, his dire financial situation, his prior experience working as a contractor for the U.S. government in Iraq, or his involvement in any other investigations as a CHS, many unanswered questions remain regarding Muhamed's understanding of his compensation agreement with the FBI. Moreover,

23

had Defendants been able to question employees in greater detail regarding FBI policies regarding the handling and compensation of Confidential Human Sources, it is entirely possible that the government's decision to delay a substantial payment to its lone testifying CHS until after trial might have been uncovered during cross examination. Or, perhaps the government would not have delayed the payment or avoided disclosing this decision before trial.

C.     Similarly, the Court erred in excluding evidence of recorded statements made between investigators regarding their impressions of the course of the investigation. In particular, the Court barred the Defendants from questioning Jennifer Grandsard, an employee of the FBI involved in the investigation, in the presence of the jury regarding statements she made characterizing a meeting as "Beating the dead horse known as Jones." This statement and Grandsard's testimony regarding it amounted to circumstantial evidence of the force and scope of the government's inducement in this case as well as Grandsard's opinion regarding Jones' predisposition at the time. By preventing Defendants from calling Grandsard to testify before the jury, the Court impermissibly limited Defendants' ability to adequately present their entrapment defense to the jury.

D.     Collectively, the cumulative effect of the trial errors acted to deprive Jones of his constitutional right to a fair trial. As the Seventh Circuit has noted, even considerable evidence against a defendant does not inoculate against such cumulative error. *United States v. Santos*, 201F.3d 953, 965 (7th Cir. 2000). At bottom, these compounded errors prevented Jones from completely presenting his theory of defense to the jury and so deprived him of his constitutional right to a

meaningful opportunity to present a complete defense.

E.   Defendant Jones incorporates herein by reference and expressly reasserts and preserves all written pleadings, motions to suppress, motions for severance, and all oral motions, objections, requests, and arguments made before, during, and after trial by Defendant Edward Schimenti.

## VI.   Conclusion

For the reasons set forth above, Defendant Joseph Jones moves this Court to enter a judgment of acquittal or, if such remedy is not appropriate, in the alternative, Jones moves for a new trial.

Respectfully submitted,

**JOSEPH JONES,**

By:   s/ Patrick E. Boyle
      By his Attorneys Patrick E. Boyle and
                      James Vanzant

Law Offices of Patrick E. Boyle
**PATRICK E. BOYLE**
155 N. Michigan Ave. Suite 562
Chicago, IL 60601
(312) 565-2888

25

## CERTIFICATE OF FILING

I, Patrick E. Boyle, an attorney, that on January 6, 2020  I electronically filed the foregoing **Defendant Joseph Jones' Post-Trial Motions** with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, by using the CM/ECF system.

By:    s/ Patrick E. Boyle
PATRICK E. BOYLE