UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 17 CR 236 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| JOSEPH JONES and | ) | |
| EDWARD SCHIMENTI | ) | |

**GOVERNMENT'S COMBINED SENTENCING MEMORANDUM**

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby respectfully submits its combined Sentencing Memorandum for both defendants.

## I. PROCEDURAL HISTORY

On or about April 12, 2017, defendants Joseph Jones and Edward Schimenti were arrested pursuant to a federal criminal complaint which charged the defendants with one count of conspiracy to provide material support to a foreign terrorist organization, specifically ISIS, in violation of Title 18, United States Code, Section 2339B(a)(1). On April 27, 2017, a one-count indictment was returned, which charged both defendants with the same offense (Count One). On April 5, 2018, a superseding indictment was returned which charged defendant Schimenti with knowingly and willfully making materially false, fictitious, and fraudulent statements and representations involving international terrorism in a matter within the jurisdiction of the Federal Bureau of Investigation, in violation of Title 18, United States Code, Section 1001(a)(1) (Count Two).

On June 20, 2019, after a three week jury trial, both defendants were found guilty of Count One and Schimenti was found guilty of Count Two.

Schimenti is currently scheduled to be sentenced on April 9, 2020 and Jones is currently scheduled to be sentenced on April 15, 2020.

As detailed below, the defendants' conduct was egregious and dangerous. They were fully aware, and encouraging of, the murderous acts committed by ISIS yet, when provided with the opportunity, did not hesitate to provide support to the group. Their sentence needs to reflect the potential dangerousness of their conduct. Schimenti, additionally, lied to agents about the CHS in order to protect the CHS and provide him an opportunity to complete the mission.

However, the government also recognizes that at the time of the government's engagement with them, as much as they desired to support ISIS, they were not actively plotting to either travel to join ISIS, looking to facilitate travel for others, or to commit a terrorist attack in the United States. On the spectrum of comparable terrorism cases, the government does not believe a statutory maximum sentence is warranted.

Considering all of the relevant factors, the government recommends a sentence of 17 years' incarceration for Joseph Jones to be followed by lifetime supervised release.

Because of Schimenti's lies to the FBI, he warrants a higher sentence than Jones. The government further recommends a sentence of 20 years' incarceration for Edward Schimenti to be followed by lifetime supervised release.

## II.    FACTUAL BACKGROUND

Both Jones and Schimenti attempted to help ISIS, which they knew to be a foreign terrorist organization that conducted suicide bombings, torture, and grotesque executions of captives, including beheadings. The defendants were convicted of assisting a confidential human source ("CHS") to travel to join ISIS and supplying him with cell phones intended to be used to detonate bombs. This conduct took place between February and April 2017.

Defendants' support for ISIS, however, dates back to at least 2015, when they caught the government's attention partly based on their online activity where they vocally demonstrated their support for ISIS and violent jihad. There can be no doubt that by the time of the charged conduct, they knew precisely the sort of terrorist activity they were attempting to support.

### A.    Jones' Online Activity

Jones posted numerous statements in support of ISIS and violent jihad using his Google+ account held under the name "Yusuf Abdulahad." For example, in or about March and April 2015, Jones posted on Google+ account Yusuf Abdulahad the following statements:

- "Relying on man made system will only continue our slaughter at the hands of the filthy disbelievers claiming to protect us."

- "They lie so much the media said 2 weeks ago the city was taken from Islamic State…May Allah curse the wicked and aid the mujahideen [mujahideen refers to individuals engaged in jihad]."

- "Brother there is no such thing as a moderate Muslim. That is the name Kaffirs [non-believers] give to weak minded material loving sellouts. The intention of these people is to put kafir in a ruling position instead of Allah."

3

- "So I was searching eBay for a black islamic flag…nothing but filthy shia and iranian flags pop up."

Also using Google+ account Yusuf Abdulahad, Jones authored publicly-available posts arguing against other Google+ users who did not share his support for violent extremism. For example, in a May 2015 exchange with another Google+ user, Jones stated, "No one else gives a dam about ruling by Islam no one else is fighting against oppression of the believers so please do not disrespect the mujahedeen [jihadi fighters] of Iraq Syria West Africa or any in the world."

During this same time period, Jones posted articles, essays, ISIS videos and a Islamic State "travel guide," that demonstrated his support for ISIS.

In addition to publicly posting his support of ISIS, Jones made private posts supporting ISIS. For example, on or about October 22, 2015, Jones shared privately a video originally shared by a Google+ Community which translates to, "the Glare of the Caliphate."[1] The video is titled "Some of the Deadly Stabbing Ways: Do not Forget to Poison the Knife." The video demonstrates how to kill another person.

### B.    Schimenti's Online Activity

Schimenti posted numerous statements in support of ISIS and violent jihad using his Google+ account "Ed Schimenti." For example, on or about April 3, 2015, on the publicly available portion of his Google+ account, Schimenti authored a post stating, "Kuffar [unbelievers], we are coming to slay you." On or about April 23, 2015,

---

[1]    This posting was observed by an undercover law enforcement employee ("UC3"), who had friended Jones online, and therefore received Jones's non-public posts.

Schimenti commented, "Islamic State will control your country, matter of fact, Islam will dominate the world!!"

On or about May 10, 2015, Schimenti displayed the ISIS flag on his Google+ account and depicted an individual associated with the designated foreign terrorist organization Boko Haram claiming credit for attacks on Lagos and Abuja, Nigeria. In a posting, Schimenti stated, "May Allah reward this fierce mujahideen who uses his life, body, and earthly might to make Allah's Law govern all, may Allah reward him for striking fear in the hearts of the taghut and the disbelievers in general." In an act of foreshadowing with regard to Schimenti's later support for the CHS and his efforts to travel to fight for ISIS, Schimenti continued his comments regarding this Boko Haram post by saying, "May Allah reward this brother who has left his family and life to fight for establishment of the Islamic State…I love him…what can the kuffar do.? They have noone…"

On or about June 7, 2015, Schimenti posted a photograph of a masked individual holding a knife with the ISIS flag in the background, and the caption of this photo stated, "IF YOU CAN'T MAKE HIJRAH [travel to fight jihad] THEN SLAUGHTER THE PAGANS NEXT TO YOU."

Schimenti also posted numerous statements in support of ISIS and violent jihad on his Facebook account. For example, on the publicly available portion of the Facebook account "Ed Schimenti," in or about December 2014, Schimenti posted, "I like 2 spread Islam. It's where I found my honor/worth. I love my brothers/sisters fighting 2 expand territory of Islamic State/all Muslims. 2 the CIA on Facebook,

5

Muslims are a lil smarter. Just had convo's w/2spies playing good cop/bad cop asking about my allegiance…6/29/2014!" June 29, 2014 is the date deceased ISIS leader Abu Bakr al Baghdadi declared ISIS to be the Islamic Caliphate.

### C. Jones and Schimenti meet UC1 and UC2

To state the obvious, the defendants' online statements were troubling and prompted the FBI to open an investigation in order to determine if the defendants were planning on providing support to ISIS either by traveling to join ISIS or through some other way. In order to ascertain their true intentions, the FBI created a ruse scenario to introduce an undercover employee to Jones.

### 1. Jones discusses violent jihad with UC1 and UC2

On September 1, 2015, an FBI undercover employee (UC1) introduced himself to Jones at the Zion Police Department in Zion, Illinois.[2] As part of the ruse, UC1 posed as a recently detained individual brought into the police department for questioning after a traffic stop. During this meeting, UC1 and Jones exchanged their contact information and thereafter began communicating online where they exchanged ISIS videos and articles.

On October 20, 2015, UC1 and Jones discussed the videos. UC1 asked Jones, "Were those brothers soldiers from the Islamic State trying to establish the caliphate in Africa?" Jones replied, "yes they are from the Islamic state and those brothers have given bayah [an oath or allegiance] to the Khilafah [leader of ISIS]." Jones stated, "I

---

[2]     Jones was asked to be at the police station to be interviewed regarding the murder of one of his friends.

will send more. Have you saw the Flames of war video?" UC1 asked Jones, "have you ever thought about going over to the caliphate [ISIS]?" Jones replied, "Every night and day. U?" UC1 responded, "Same here." Jones told UC1, "The more I see the expansion of the Islamic state the stronger my faith grows. I always pray for them to continue expanding and for us here in this part of the world's top get a better understanding of the truth." Jones concluded the discussion by saying, "I will send a video that shows brothers from all over the world speaking about living in the land of Khilafah even their children. All races and colors living together SubhanAllah [greatness of God]."

During the course of their conversations, UC1 indicated to Jones that he knew a person (UC2) who could assist in facilitating travel to join ISIS. UC1 ultimately told Jones that he was going to leave the U.S. to join ISIS with UC2's help.

### 2. December 29, 2015, meeting between UC1, UC2, Jones and Schimenti

On December 29, 2015, UC1 and UC2 met with Jones and Schimenti in Waukegan, Illinois. During this meeting, Jones confirmed that he had given bay'ah, meaning an oath or allegiance to ISIS.

During the same meeting, Jones stated to UC1 and UC2 that Schimenti wanted to talk about jihad with everybody, but Schimenti should be smart and not put everyone else in jeopardy by discussing jihad so openly. Jones further stated that Schimenti brought the feds into their life.[3] UC2 asked the defendants if they had

---

[3]     On or about December 12 and 16, 2015, Schimenti and Jones, respectively, were each interviewed regarding a purported terrorist plot overseas after Schimenti was identified in

pledged Bay'at (allegiance) to ISIS. This caused Schimenti to become suspicious and believe that UC1 and UC2 were law enforcement. He then abruptly left the meeting.

### 3. Jones meets with UC1 before UC1 purportedly travels to join ISIS

On March 11, 2016, UC1 met with Jones at a coffee shop in Zion. During this meeting, UC1 advised Jones that UC1 would be leaving to join "Dawla Islamiya [ISIS]" in April or May 2016 to join "Al-Baghdadi." Furthermore, during this meeting UC1 provided an ISIS flag to Jones. In April 2016, Jones sent UC3, who Jones met online, pictures of him and Schimenti holding the ISIS flag while at the Illinois State Beach Park. Jones requested UC3 post this picture on UC3's Google+ account with the caption "Support from dar ul kuffar [the land of infidels]!"

On May 12, 2016, UC1 informed Jones that UC1's and UC2's plans had been confirmed to depart from Chicago O'Hare International Airport on May 20, 2016.

On June 16, 2016, UC2 met with Jones in Zion, Illinois. UC2 explained the details of UC2's purported ISIS facilitation network. UC2 explained the ISIS facilitation network involved another individual (Individual A), who assisted in getting individuals from the United States to Syria. UC2 explained that once the traveling individual arrived in a country bordering Syria, this ISIS facilitation network would safely transport the traveling individual across the border into Syria. Finally, once in Syria, the traveling individual will enter ISIS-held territory to begin their training to become a fighter for ISIS. During this meeting, UC2 showed pictures

---

the media as a participant in the plot. There is no evidence that they were involved in this alleged plot.

of UC1, UC2, and Individual A purportedly traveling from North America to the Middle East, along with a portion of UC1's video explaining UC1's motivations for wanting to join ISIS and fight to defend ISIS. UC2 told Jones that UC1 made the video while in the Middle East before crossing the border into Syria.

### 4. UC4

On October 26, 2015, Jones initiated contact online with another FBI undercover employee ("UC4"). During their communications, UC4 indicated to Jones that UC4 would like to travel to join ISIS. Jones said he knows a person who can help and met with UC4 in order to vet UC4 before introducing him to UC2. Jones then arranged and attended a meeting where he introduced UC4 to UC2 in order to facilitate UC4's travel to ISIS-controlled territory. In or about January 2017, UC4 informed Jones that he was traveling to Syria soon.

### D. Confidential Human Source

Although the FBI was engaging with Jones, Schimenti was still a concern. In November 2016, the FBI directed CHS to get a job at Schimenti's place of employment in order to interact with Schimenti. The CHS was hired and became friendly with Schimenti to the point where they socialized after work.

During the initial social outings, after CHS learned that Schimenti supported ISIS, CHS informed Schimenti that CHS had a brother in ISIS and that he wished to join his brother in Syria. Schimenti told the CHS that Jones knew an individual (UC2) who could help the CHS travel to ISIS. Schimenti cautioned the CHS and cited

an example of a "brother" who attempted to join ISIS and, as a result, is currently in federal prison.

On February 17, 2017, the CHS met with Schimenti in Waukegan, Illinois. During this meeting, the CHS told Schimenti that the CHS's brother stated that the ISIS fighters were tracked by the drones because the phones they were buying in Syria were compromised. The CHS further stated the CHS's brother purportedly wanted the CHS to obtain phones in the United States, and bring the phones to ISIS members overseas when the CHS travels to Syria. During a later meeting, the CHS told Schimenti that the CHS thought the ISIS fighters overseas, including his purported brother, would use some of the cell phones for "bombs" and attach them to "C4" (a type of explosive).

Schimenti helped the CHS prepare for his membership in ISIS. Schimenti trained the CHS at the gym to get the CHS into fighting shape so that he could fight "hand-to-hand." While at the gym, Schimenti expressed his desire to be the one to "cut the neck" of the kuffars (or non-believers). Schimenti also added, "To all you kuffar army, look at how we train."

Schimenti also helped the CHS purchase phones by taking him to a cellular telephone store. During one visit, after the CHS told Schimenti not to provide any financial assistance, Schimenti purchased a phone charger for the CHS. Schimenti justified the purchase by saying, "I know what these are going for."

Schimenti introduced the CHS to Jones and the three started to socialize together, which included Schimenti and Jones playing graphic ISIS videos. Almost

immediately upon meeting the CHS, Jones began discussing UC2 and the ISIS facilitation network. On March 11, 2017, Jones reached out to UC2 and told him that "Brother there is another brother who is ready." Jones explained to UC2 that the CHS was ready to go and was looking to get to ISIS-controlled territory with the help of UC2's facilitation network."

On March 12, 2017, the Shementi, Jones and CHS were at Jones' house watching ISIS videos. At that time, Jones provided the CHS with two cell phones and offered to get more. The CHS offered Jones money for the phone. Jones stated he did not want any money but claimed he needed "something for the hereafter."

During the meeting, the CHS told Jones and Schimenti that the CHS watched on YouTube what the brothers [ISIS fighters] do with the phones. As the CHS paused to remember a specific word in English, Schimenti interrupted and asked, "Detonator?" The CHS confirmed the word "detonator" was the word that the CHS was attempting to remember. Jones further stated if the CHS provides the CHS aunt's address, Jones would continue to provide phones to the CHS after CHS leaves the United States and joins ISIS.

On March 26, 2017, the CHS and Jones met with UC2 in Gurnee, Illinois. During the drive to the meeting, Jones stated that he knew "another brother named [UC4]." Jones continued, "I helped [UC4] leave [to join ISIS] too." Jones told the CHS that UC2 never asked Jones to find more people or showed Jones anything to be nervous about.

While waiting in the CHS's vehicle for UC2 to arrive at the meeting location, the CHS showed a video of a Humvee being hit by an IED. The CHS explained that ISIS fighters were attaching phones to explosives to blow up vehicles and that is what ISIS would be using the cell phones that Schimenti and Jones provided to the CHS.

After the meeting with UC2, Schimenti, Jones and the CHS gathered at Jones' home. While there, Jones provided an additional cell phone to the CHS. Jones stated he hoped it would kill many "kuffar [non-believers]." Schimenti also said, "Many." The CHS said when the CHS makes it to Syria, the CHS will make a video and upload it for Jones and Schimenti to view. Schimenti stated if he sees the CHS "cutting the kuffar neck," Schimenti will be "so happy that day."

The cell phone Jones provided to the CHS came from Ratesha Darden who testified at trial that Jones asked her to provide him with cell phones. Jones asked her, via text message, "do you have any old cell phones that you don't have use for? It doesn't matter if they work or not." She told him that she has a phone she can give him and he responded, "I'm trying to get as many as I can so if you know anyone else who has one, see if you can get it." Darden gave Jones her daughter's cell phone and he told her "the brother's really appreciate it." He then told her that the phones "are really beneficial to the State [ISIS]."

On or about March 29, 2017, the CHS met with Schimenti at the CHS's residence in Chicago, Illinois. While driving to a restaurant, Schimenti claimed he called three places looking for phones to give to the CHS. Schimenti then gave the CHS six phones in a bag. The CHS asked Schimenti how much he paid [for the

phones]. Schimenti responded, "Five dollars." When the CHS told Schimenti that the CHS would pay Schimenti back, Schimenti declined the offer and stated, "I know where they're going." The CHS stated that the CHS hoped each one would kill 20 people. Schimenti responded, "Many kuffar."

Later that day, while at the CHS's residence, the CHS showed Schimenti a video clip of a Humvee being blown up by an IED (the same clip he previously showed Jones). The CHS explained that the phones Jones and Schimenti provided were being used for this purpose. In the video clip, as the Humvee approaches the IED, Schimenti stated, "Landmine." After the IED goes off in the video clip, Schimenti exclaimed, "Yes. Yes."

While still at the CHS's residence, during prayers, Schimenti prayed that Allah "continue to expand your State…protect all the mujahedeen…continue to humiliate the kuffars."

Schimenti also assisted the CHS in preparation for his travel by taking the CHS shopping to fulfill a list of items the CHS needed for his travel. While shopping, after the CHS expressed excitement for his trip and that he would send Schimenti videos, Schimenti stated, "I want to see blood flowing, either way." A short time later, Schimenti said, "You can Google my name and I put it in English so the Kuffar can see, Islamic State here to stay!"

On April 7, 2017, Schimenti and Jones ate dinner with the CHS. During the meal, Jones told the CHS that he felt ashamed that he was not traveling as well. Schimenti told the CHS to "drench that land with they, they blood." Afterward,

Schimenti and Jones drove the CHS to O'Hare International Airport in Chicago with the understanding that the CHS would be traveling from Chicago to Syria to join and fight with ISIS.

### E.    Schimenti's Post-Arrest Interview

On April 11, 2017, Jones and Schimenti were arrested on a complaint and were taken to an FBI office. They both waived their rights and agreed to be interviewed. Schimenti proceeded to make multiple false statements regarding his provision, and purpose, of phones to the CHS, saying, for example, "with the cell phones, that it was going for a bomb? No, not at all." Schimenti also lied about his knowledge of the purpose of the CHS's travel to Syria, telling the agents that the CHS was "tired of living here and he wanted to see his mom. I don't know what his complete intentions were." He also stated he was not aware of any other purpose of the travel and that he just wanted to make sure his mother was safe.

### III.    SENTENCING GUIDELINES CALCULATION

The Government concurs with the sentencing guidelines calculations set forth in each defendant's Pre-Sentence Report. Based on a total offense level of 40 (Jones) or 42 (Schimenti) and a criminal history category of VI, the advisory guideline range for both defendants is life. For Jones, this range is limited to the statutory maximum of 20 years of imprisonment; for Schimenti, it is limited to the statutory maximum of 28 years of imprisonment.

### IV.    APPLICATION OF § 3553(A) FACTORS

As part of the sentencing process, the Court is to consider the factors set forth in 18 U.S.C. § 3553(a) and impose a sentence that is sufficient, but not more than

14

necessary, to achieve the goals of sentencing. In particular, Section 3553(a) requires the Court to consider, among other factors: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (4) to afford adequate deterrence; and (5) to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct.

### A.    Nature and circumstances of the offense

The offense conduct is very serious and warrants significant term of imprisonment. The defendants deliberately attempted to assist an extremely violent terrorist group they knew was engaged in a wide range of atrocities. Not only were defendants aware of these atrocities, they celebrated them, gleefully watching horrific execution videos and sharing such ISIS propaganda online.

The FBI provided Schimenti an opportunity to support ISIS through assisting the CHS to join his brother in ISIS and by providing cell phones to the brother to be used by ISIS for bombs. Schimenti availed himself of the opportunity and took it upon himself to bring Jones into the scheme.

Although Schimenti brought Jones into the scheme, Jones was equally eager to help the CHS. Jones, as he had done previously when he assisted UC4's travel, introduced UC2, the ISIS facilitator, to the CHS. Jones, again as he had previously done with UC4, vetted the CHS for UC2, and arranged and attended the meeting with UC2. Jones, in effect, vouched for, and sponsored, the CHS.

There can be no doubt that defendants intended to further the violent activities of ISIS. The defendants supplied the CHS with cell phones they believed would be used by ISIS to kill "kuffars." They discussed the use of the phones as "detonators" and celebrated a video of a roadside bomb. They provided this assistance to the CHS to facilitate his travel to join ISIS in hopes that he would "cut the necks" of the kuffars. They believed that their efforts to assist in terrorist violence would be rewarded in the afterlife.

The severity of the crime and the grave consequences that the defendants sought to inflict on others warrants a significant term of imprisonment.

**B.    History and characteristics of the defendants**

The government recognizes that both defendants have loving and supportive families as set forth in the PSR. Yet, despite that, they knowingly decided to jeopardize those relationships by committing the criminal conduct for which they've been convicted. Moreover, by supporting violent acts in support of ISIS, they acted with disregard for the well-being of others and the fact that these violent act would impact those individuals and the families that care for them.

Jones, through his trial testimony and sentencing filings, has attempted to minimize his conduct, spin it around and present it in a humanitarian light. Those were lies. The evidence at trial, as outlined above, reveals the truth – that he supported and celebrated ISIS and their brutally violent ways.

For example, Jones testified that he was open minded to all Muslims and did not want to see people get killed, and that his support for ISIS grew out of a college

16

paper he wrote that addressed the Arab Spring. He testified that, through his research, he was shocked at the brutal conduct of the Assad regime to its own people and that he supported ISIS because they were trying to create an Islamic State ruled by Sharia law. However, when Jones was not speaking to an audience that held his fate in their hands, he told the CHS that "Shia Muslims should be killed like cockroaches." (ISIS is Sunni). Again, when speaking to ISIS supporters, Jones showed his true colors – and expressed a desire to see many kuffars killed.

Schimenti was consumed with ISIS as demonstrated by his social media postings, his conversations with the CHS, and even through Jones' testimony (Jones testified that "Schimenti was ecstatic about the Islamic State"). Schimenti introduced Jones to ISIS and brought Jones into the criminal conspiracy by introducing him to the CHS for the express purpose of allowing Jones to facilitate the CHS's travel to ISIS through an introduction to UC2.

Schimenti's online activities went beyond posting support for ISIS. Kelly Turnipseed, Schimenti's former girlfriend and roommate, testified at trial that she witnessed Schimenti conversing online with a person who appeared to be Middle Eastern, wearing camouflage, with a gun and located in a desert area. In the background she saw an Islamic flag and she could hear the sound of gunfire. The implication is that Schimenti was talking to a genuine ISIS fighter (this was not law enforcement). She also testified that Schimenti expressed his support for ISIS and that he stated he wished he "could go over there and to help and fight with Islamic State."

17

While defendants have shown that they can be caring to their family and friends, they have also shown they are willing to support violence against those who oppose ISIS. This factor again supports a sentence of 20 years for Schimenti and 17 years for Jones.

### C. Reflect seriousness of offense, promote respect for the law, and provide just punishment

Providing support to a terrorist group is a very serious offense and combatting such support is one of the government's highest priorities. The defendants' conduct, in particular the provision of providing the cell phones with the belief, expectation, and hope that it would kill "many kuffars," is horrific.

At trial, Jones attempted to falsely convey to the jury that his motivation for his conduct was humanitarian. Jones testified at trial that he provided working cell phones in order to save "a child, a grandmother, an ISIS fighter" from being droned by the Assad regime. Jones was careful in his testimony to point out that he only gave working phones, not broken phones, because he acknowledged that the CHS told him broken phones were being used as IED parts. In reality, Jones' motivation was to support ISIS and to help them kill "kuffars," not to help save the lives of children or the elderly. His testimony to the contrary belies statements he made during the conspiracy – Jones texted Ratesha Darden and asked "do you have any old cell phones you don't have use for? It doesn't matter if they work *or not*." He encouraged her to try to get as many cell phones as she could and that it would help the brothers in the "State" – ISIS. Contrary to his testimony, Jones believed, and hoped, that the phones he collected would be used by ISIS to kill people.

18

Schimenti also had an ISIS blood lust. After watching a video of an IED that was triggered by a cell phone, shown to him by the CHS who stated that each of the phones Schimenti and Jones provided will kill 20 people, Schimenti replied "many kuffar" and that he wanted "to see the blood flowing."

Schimenti also expressed a desire to commit an attack at the Great Lakes Naval Base. He told the CHS that he's "always thinking" of the Naval graduation that takes place on "Buckley." Schimenti stated the Navy has graduations there every Friday and there are "Many people...always thinking akhi, so pray I get the faith." Kelly Turnipseed testified that when she and Schimenti would drive past the Great Lakes Naval Station, Schimenti often indicated that he desired to commit an attack against the soldiers stationed there.

To be perfectly clear, the defendants believed that every phone equaled a bomb and each bomb would bring harm to enemies of ISIS. They showed no compassion for their intended victims or their families.

Schimenti, in addition to his support to ISIS, also demonstrated a complete lack of respect for the law when, after being informed that lying to the FBI was a crime, made multiple false statements to the agents in an attempt to cover up the crime and protect the CHS.

The defendants' conduct crossed a line from talk to action – specifically, assisting in furthering ISIS's violent methodology of enforcing their ideology. The punishment should reflect the seriousness of their actions, promote respect for the

19

law, and be just and tailored to the particular matter. A sentence of 20 years for Schimenti and 17 years for Jones will do just that.

### D. Afford adequate deterrence

A sentence of 20 years and 17 years will deter other individuals who may be considering providing support to a terrorist organization, however, the government is particularly focused on specific deterrence against the defendants.

In late 2015, the media reported that Schimenti was involved with individuals in Switzerland who may have been plotting to commit an act of terrorism. On December 12 and 15, 2015, in response to the reporting, FBI agents separately interviewed the defendants. That encounter with the FBI alerted the defendants that they were on the FBI's radar. In fact, to that point, a few days after the FBI interviews, Schimenti stormed out of a meeting with UC1 and UC2 because he believed they were law enforcement.

Moreover, Schimenti was acutely attuned to the fact that his conduct was against the law. On several occasions he told the CHS that he (the CHS) could go to prison for traveling to join ISIS. Kelly Turnipseed testified that Schimenti told her he supported ISIS and that he wanted to help them by traveling overseas to fight but that he had not done so because he feared being arrested.

Despite clearly knowing their conduct was against the law and despite knowing that they were on the FBI's radar, the defendants were not deterred – they just worked harder to conceal their illegal conduct. They engaged in a plot to provide support to ISIS in a manner that they believed insulated them - with the CHS acting

as their proxy. Defendants saw the CHS as an opportunity for "ajr" - rewards in heaven – while providing them with plausible deniability. In other words, they were not the ones traveling, therefore, they were not the ones who were at risk of being arrested.

Based on their conduct, to include Schimenti's lies to the FBI, the trial testimony of Jones, and their complete lack of remorse, there is no reason to believe that, if given the opportunity again, the defendants would not provide material support to ISIS or some other terrorist organization with a similar ideology.

Because of their bravado, this Court should impose a sentence of 20 years for Schimenti and 17 years for Jones. That sentence will deter the defendants from providing any support to a terrorist organization once released from custody.

### E. Disparities among sentences

The government has attempted to identify factually comparable terrorism cases in order to provide the Court with a historical range of sentences the Court may consider in fashioning the defendants' sentences.

In *United States v. Young*, 916 F.3d 368 (4th Cir. 2019), Young engaged with "Mo," a FBI source whom Young believed was interested in traveling to Syria to join ISIS. Young aided Mo's efforts by offering advice on how to travel overseas without being flagged by government authorities. During the investigation, FBI agents interviewed Young under the guise of locating Mo. Like Schimenti, Young lied to the agents and the investigation continued after the interview. Young believed Mo had successfully joined ISIS, and Young sent Mo Google gift cards in order for ISIS

21

members to be able to communicate via encrypted applications. Young was convicted by a jury of attempting to provide material support to ISIS in violation of Title 18, United States Code, Section 2339B, and of obstruction of justice for making false statements, in violation of Title 18, United States Code, Section 1512(c)(2). Young was sentenced to 15 years' incarceration (the obstruction charge was overturned).

In *United States v. Robert Hester*, (W.D. Mo., March 4, 2020, 17-CR-64), Hester caught the attention of the FBI when he expressed support for ISIS online. The FBI engaged with Hester, first online, and then in person through an undercover agent. Hester expressed to the undercover agent a strong desire to commit an attack in the United States. Like Schimenti and Jones, Hester, along with other conduct in support of an attack, ultimately purchased supplies which he provided to the undercover agent, that he believed would be used to build bombs for the mass casualty attack. Hester pled guilty to one count of attempting to provide material support to ISIS in violation of Title 18, United States Code, Section 2339B and was sentenced to 19 years and 2 months.

In *United States v. Ahmed Mohammed El Gammal*, (S.D.N.Y., February 17, 2019, 15-CR-588), El Gammal was a prolific advocate for ISIS on social media who assisted and encouraged Samy El-Goarany to travel to Syria and join ISIS. El Gammal traveled to New York to meet El-Goarany, he vetted El-Goarany and introduced El-Goarany to an associate in Turkey to help facilitate El-Goarany's travel. Further, El Gammal tried to cover his tracks by deleting numerous social media messages related to El-Goarany and instructing others to do the same. El-

Goarany successfully traveled to Syria and was ultimately killed. El Gammal was convicted by a jury of multiple counts, including providing material support to ISIS in violation of Title 18, United States Code, Section 2339B. He was sentenced to a total of 12 years' incarceration.

In *United States v. Ali Shukri Amin*, (E.D. VA., August 28, 2015, 15-CR-164), Ali Shukri Amin, 17 at the time, pled guilty to one count of providing material support to ISIS in violation of Title 18, United States Code, Section 2339B. Amin used social media to encourage people to travel to Syria to join ISIS and he actively assisted an 18 year old's travel. Like Schimenti and Jones, Amin secured a ride to the airport for the traveler, among other support, and like Schimenti, tried to hide the traveler's plan to join ISIS by giving a concocted story to investigators looking for the traveler. Amin was initially sentenced to over 11 years' incarceration but, after the government filed a motion for a reduction of sentence for cooperation pursuant to Fed. R. Crim. Pr. 35, his sentence was reduced to 6 years.

These cases support the government's sentencing recommendation of 20 years for Schimenti and 17 years for Jones.

## V. SUPERVISED RELEASE

The government recommends the following conditions of supervised release for both

defendants:

### Mandatory Conditions

- The defendants shall not commit another federal, state or local offense. *See* 18 U.S.C. § 3583(d); Guideline § 5D1.3(a)(1).

- The defendants shall not unlawfully possess a controlled substance. *See* 18 U.S.C. § 3583(d); Guideline § 5D1.3(a)(2).

- The defendants shall submit to the collection of a DNA sample from the defendant at the direction of the U.S. Probation Office if the collection of such a sample is authorized pursuant to 42 U.S.C. § 14135a(a). *See* 18 U.S.C. § 3583(d); Guideline § 5D1.3(a)(8).

- The defendants shall pay the assessment imposed in accordance with 18 U.S.C. § 3013. *See* Guideline § 5D1.3(a)(6)(B).

### Discretionary Conditions to Promote Respect for the Law and Deter the Defendant From Committing Future Crimes

- The defendants shall report to the probation officer in the federal judicial district where he is authorized to reside within 72 hours of release from imprisonment. *See* Guideline § 5D1.3(c)(1);

- The defendants shall not leave the judicial district in which the defendant is being supervised without the permission of the court or the probation officer. *See* Guideline § 5D1.3(c)(3);

- The defendants shall answer truthfully the questions asked by the probation officer. *See* Guideline § 5D1.3(c)(4);

- The defendants shall notify the probation officer of any change in residence, employer, or workplace within 72 hours. *See* Guideline § 5D1.3(c)(5);

- The defendants shall permit the probation officer to visit the defendant at home or work at any reasonable time, and to confiscate any contraband prohibited by the conditions of the defendant's supervision that are in plain view of the officer. *See* Guideline § 5D1.3(c)(6).

- The defendants shall seek, and work conscientiously, at lawful employment or pursue conscientiously a course of study or vocational training that will equip defendant for employment, unless excused by the probation officer. *See* Guideline § 5D1.3(c)(7).

- The defendants shall not meet, communicate, or otherwise interact with a person whom they know to be engaged, or planning to be engaged, in criminal activity. *See* Guideline § 5D1.3(c)(8).

- The defendants shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer. *See* Guideline § 5D1.3(c)(9).

- The defendants shall refrain from excessive use of alcohol (defined as having a blood alcohol concentration greater than 0.08%), or any use of a narcotic drug or other controlled substance, as defined in § 102 of the Controlled Substances Act (21 U.S.C. § 802), without a prescription by a licensed medical practitioner. *See* Guideline § 5D1.3(d)(4).

- The defendants shall submit his person, property, house, residence, vehicle papers [computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media,] or office, to a search conducted by a United States Probation Officer. Failure to submit to a search may be grounds for revocation of release. The defendants shall warn any other occupants that the premises may be subject to searches pursuant to this conduction. An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that the defendant has violated has violated a condition of his supervision and that the areas to be searched contain evidence of this violation. Any search must conducted at a reasonable time and in a reasonable manner.

- The defendants shall comply with the requirements of the Computer and Internet Monitoring Program as administered by the United States Probation Office. The defendants shall consent to the installation of computer monitoring software on all identified computers to which defendant has access. The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, Internet use history, email correspondence, and chat conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of monitoring software. The defendants shall not remove, tamper with, reverse engineer, or in any way circumvent the software.

  The cost of monitoring shall be paid by each defendant at the monthly contractual rate, if the defendant is financially able, subject to satisfaction of other financial obligations imposed by this judgment.

The defendants shall not possess or use any device with access to any online computer service at any location (including place of employment) without the prior approval of a probation officer. This includes any Internet service provider, bulletin board system, or any other public or private network or email system.

- The defendants shall be required to submit to periodic polygraph testing at the direction of the probation office as a means to ensure that the defendants are in compliance with the requirements of their supervision or treatment program.

**Discretionary Conditions to Ensure Safety to Others**

- The defendants shall refrain from possessing a firearm, destructive device, or other dangerous weapon. *See* 18 U.S.C. § 922(g); Guideline § 5D1.3(c)(10).

## CONCLUSION

The government requests that the Court sentence Joseph Jones to 17 years' incarceration to be followed by lifetime period of supervised release and sentence Edward Schimenti to 20 years' incarceration to be followed by lifetime period of supervised release.

Respectfully submitted,

JOHN L. LAUSCH, Jr.
United States Attorney

By:     /s/*Barry Jonas*
BARRY JONAS
RAJNATH LAUD
DAVID ROJAS
Assistant U.S. Attorneys
219 South Dearborn Street, Fifth Floor
Chicago, Illinois 60604