UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **United States of America,** | |
| Plaintiff, | |
| v. | **No. 1:17-cr-236-1** |
| **Joseph Jones,** | Judge Andrea R. Wood |
| Defendant. | |

## Sentencing Memorandum of Joseph Jones

Defendant Joseph Jones, through undersigned counsel, respectfully submits this sentencing memorandum. Based on the discussion below, defense counsel requests that the Court impose a sentence of time served, which will be 46 months as of the date of sentencing.

## Table of Contents[1]

1.   Nature and circumstances of the offense ..................................- 1 -

2.   The sentencing guidelines overstate the seriousness of the offense because they are not based on empirical evidence ......................- 1 -

3.   Sentences of similarly situated defendants................................- 4 -

   3.1.   Nationwide statistics.........................................................- 4 -

   3.2.   Individual comparators.....................................................- 6 -

4.   Racial disparities in sentencing ...............................................- 11 -

5.   History and characteristics of the defendant ...........................- 15 -

   5.1.   Early years .......................................................................- 15 -

   5.2.   His father's descent into addiction ...................................- 17 -

   5.3.   Joseph's own troubles begin.............................................- 18 -

   5.4.   Joseph hits rock bottom ...................................................- 19 -

   5.5.   Joseph begins to turn his life around................................- 20 -

   5.6.   Islam is a catalyst for positive change in Joseph's life .......- 21 -

   5.7.   Joseph stabilizes his life ..................................................- 22 -

   5.8.   Joseph seeks guidance in living his faith in Islam .............- 23 -

6.   Deterrence does not require a lengthy sentence......................- 26 -

7.   A fine is not appropriate .........................................................- 28 -

---

[1] Most citations in this document are hyperlinked to their sources. Attached exhibits and internal cross references are denoted by SMALL CAPS, while external links are flagged with °.

1. **Nature and circumstances of the offense**

See defense version of the case and objections to the Government's version, filed at [286-1]°.

2. **The sentencing guidelines overstate the seriousness of the offense because they are not based on empirical evidence**

There is no doubt that material support for terrorism is a serious crime. But that is not to say that the sentencing guidelines adequately reflect the seriousness of the offense. When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that assure the meeting of the purposes of sentencing, 28 U.S.C. §991(b)(1)(A),° and to use average sentences imposed and prison time actually served in the pre-guidelines period as a starting point. 28 U.S.C. §994(m).° The Commission was then to continually review and revise the guidelines considering sentencing data, criminological research, and consultation with front-line actors in the criminal justice system. *See* 28 U.S.C. § 991(b)(1)(C), § 991(b)(2), § 994(o), § 995(13), (15), and (16).°

But not all guidelines were developed in this manner. *See Gall v. United States*, 552 U.S. 38, 46 & n.2 (2007);° *Kimbrough v. United States*, 552 U.S. 85, 96 (2007).° When a guideline does not exemplify the Commission's exercise of its characteristic institutional role, because the Commission did not take account of empirical data and national experience, the sentencing court is free to conclude that the guideline yields a sentence greater than necessary to achieve § 3553(a)'s purposes, "even in a mine-run case". *Id.* at 109-10.°

The primary guideline here is USSG § 2M5.3°, which was created by USSG Amendment 637 (eff. Nov. 1, 2002)°. The amendment was a response

to the passage of the USA PATRIOT Act of 2001 (Pub. L. 107-56), which defined new crimes and substantially increased the penalties for terrorism-related offenses. *See id.* Pub. L. 107-56, tit. VIII; *see also* Amendment 637, Reason for Amendment ¶ 2. This amendment was a continuation of a series of steadily increasing terrorism sentencing enhancements since 1994. *See Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror*, 126 Yale L.J. 1520, 1527 (2017).°

But when the amendment and its predecessors were promulgated, "no statistically sound evidence was used to substantiate that all terrorism defendants were so different as to necessitate such a large increase in the Guidelines range." *Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror*, 126 Yale L.J. 1520, 1550 (2017).° In fact, while the question of recidivism after terrorism-related detention is empirically fraught, the very limited available data suggests that individuals convicted of terrorism offenses do not recidivate at higher rates than those convicted of other crimes. Of the more than 300 prisoners who have completed their terrorism sentences since 2001, Justice Department officials and outside experts could identify only a handful of cases in which released inmates had been rearrested, a rate of relapse far below that for most federal inmates." *Id.*° (cleaned up).

In addition to the offense level increases, USSG § 3A1.4° requires that the defendant's criminal history category be increased to VI, regardless of the individual's actual criminal history. In this sense, USSG § 2M5.3° and USSG § 3A1.4° are comparable to the child-pornography guideline enhancements, USSG § 2G2.2°, which have been roundly criticized by the courts for this very flaw. As the Second Circuit has noted, "The § 2G2.2

sentencing enhancements cobbled together through this process routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases." *United States v. Dorvee*, 616 F.3d 174, 186 (2d Cir. 2010)°. This is contrary to the purposes of sentencing in section 3552(a), which requires individualized and proportionate sentences that distinguish between the worst offenders and those who are less dangerous. *See id.* at 186-187. Like defendants sentenced under section 2G2.2, section 2M5.3 virtually mandates that "[a]n ordinary first time offender is therefore likely to qualify for a sentence of at least 168 to 210 months, rapidly approaching the statutory maximum, based solely on sentencing enhancements that are all but inherent to the crime of conviction." *Id.* at 186.

This problem was specifically discussed in relation to material-support cases like this one in *United States v. Jumaev*, 2018 U.S. Dist. LEXIS 119916 (D. Colo. July 18, 2018)°.[2] The court observed:

> While U.S.S.G. § 2M5.3 has an internal enhancement mechanism to calibrate the severity of the sentence to the culpability of the conduct and the harm, that distinction is lost with the Terrorism Enhancement, which frequently results in Guidelines ranges that equal the maximum statutory sentence and fail to differentiate between various levels of conduct. For example, the Terrorism Enhancement would punish an individual who collects $1,000 for al-Shabaab without having any contact with the organization, the same as someone who maintained direct and continuing contact with a high-ranking member of al-Shabaab and offered the use of his house as a haven for the organization's fighters and to store bombs and other weapons.

*Id.* at 28-29° (cleaned up).

---

[2] *Jumaev* is discussed in more detail in Section 3.2.

The practical effect is that "[t]he Terrorism Enhancement treats all offenders the same, without taking into account their actual conduct or individual background, such as age and criminal history. Thus, the Enhancement undermines a basic principle of U.S. sentencing law and its underlying commitment to retributive justice: that punishment should be proportional to the crime." Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror, 126 Yale L.J. 1520, 1529 (2017).° As *Jumaev* noted, the terrorism enhancement is not backed by any empirical evidence. *Jumaev*, 2018 U.S. Dist. LEXIS 119916, at *28 & n.16°.

Consequently, the guidelines in this case do not exemplify the Commission's exercise of its characteristic institutional role and are not entitled to the usual assumption of correctness. *See United States v. Reyes-Hernandez*, 624 F.3d 405, 418 (7th Cir. 2010)° ("*Kimbrough* instructs sentencing courts to give *less* deference to guidelines that are not the product of the Commission acting in 'its characteristic role'"); *see also United States v. Ludke*, No. 16-cr-175, [108] at 23-24 (EXHIBIT 2).

### 3. Sentences of similarly situated defendants

#### 3.1. Nationwide statistics

According to U.S. Sentencing Commission data,[3] there are 100 cases in the past five years nationwide in which a defendant has been sentenced under § 2M5.3.° Of those cases, nearly a quarter of the defendants were sentenced to less than 120 months. *See Figure 1*. Median and average sentences were 180 and 175 months, respectively, largely due to the

---

[3] U.S. Sentencing Commission Interactive Data Analyzer, https://ida.ussc.gov/.°

presence in the data of artificially inflated guidelines that resulted in extraordinarily high sentences to some defendants. *See Figure 2.* The extraordinarily high guidelines computation must be tempered by the concurrent data showing substantial variances in actual sentences. *See Figure 3.*



*Figure 1 – Distribution of Imprisonment Length*



*Figure 2 – Average and median sentence length*

**Sentence Imposed Relative to Guideline Range**
Fiscal Year 2015,2016,2017,2018,2019

| Sentence Range | 2015 N | 2015 % | 2016 N | 2016 % | 2017 N | 2017 % | 2018 N | 2018 % | 2019 N | 2019 % |
|---|---|---|---|---|---|---|---|---|---|---|
| Grand Total | 13 | 100.0% | 17 | 100.0% | 17 | 100.0% | 28 | 100.0% | 15 | 100.0% |
| Within Range | 4 | 30.8% | 4 | 23.5% | 3 | 17.6% | 6 | 21.4% | 4 | 26.7% |
| §5K1.1 Substantial Assistance | - | | - | | - | | 7 | 25.0% | - | |
| Downward Departure Govt Motion | 1 | 7.7% | 1 | 5.9% | - | | - | | 1 | 6.7% |
| Non-Govt Downward Departure | 1 | 7.7% | 2 | 11.8% | 3 | 17.6% | 2 | 7.1% | 2 | 13.3% |
| Upward Variance | 1 | 7.7% | - | | - | | 1 | 3.6% | - | |
| Downward Variance Govt Motion | 1 | 7.7% | 3 | 17.6% | 1 | 5.9% | 4 | 14.3% | 2 | 13.3% |
| Non-Govt Downward Variance | 5 | 38.5% | 7 | 41.2% | 10 | 58.8% | 8 | 28.6% | 6 | 40.0% |

Export

The table includes the 100 cases reported to the Commission. Certain analyses are not presented in the table when the number of offenders falls below a minimum threshold. Cases missing information necessary to complete the analysis were excluded from this table.
Upward Departure include cases in which the sentence imposed was above the applicable guideline range and for which the court cited a reason on Part V of the Statement of Reasons form, other than §5K1.1 or §5K3.1.
Downward Departure include cases in which the sentence imposed was below the applicable guideline range and for which the court cited a reason on Part V of the Statement of Reasons form, other than §5K1.1 or §5K3.1, and where the prosecution did not initiate, propose, or stipulate to the sentence.
Variance include cases in which the sentence imposed was above the applicable guideline range and for which the court cited a reason on Part VI of the Statement of Reasons form or cases in which the sentence imposed was below the applicable guideline range and for which the court cited a reason on Part VI of the Statement of Reasons form, and where the prosecution initiated, proposed, or stipulated to the sentence or cases in which the sentence imposed was below the applicable guideline range and for which the court cited a reason on Part VI of the Statement of Reasons form, or where no reason was given, and where the prosecution did not initiate, propose, or stipulate to the sentence.
FILTER:
Fiscal Year: 2015,2016,2017,2018,2019; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: All; Guideline: §2M5.3

*Figure 3 – Sentence imposed relative to guidelines range*

### 3.2. Individual comparators

At the individual-case level, the Government has pointed to four cases for comparison. Each of these cases is either easily distinguishable from the facts of this one or supports a sentence lower than the one the Government has requested here. Perhaps more importantly, even the Government acknowledges "that at the time of the government's engagement with [Joseph and Edward], as much as they desired to support ISIS, they were not actively plotting to either travel to join ISIS, looking to facilitate travel for others, or to commit a terrorist attack in the United States." Gov. Memo, at 2°. This concession makes it abundantly clear that, absent the Government's constant urging over the course of almost two years, it is vanishingly unlikely that Joseph would have ever engaged in this crime.

Even so, on the scale of comparable crimes, Joseph undoubtedly falls at the very lowest end.

*United States v. Young*, 916 F.3d 368 (4th Cir. 2019).° Two points are worth noting here. First, the defendant was sentenced to 180 months, which is 24 months *less* than the 204 months the Government argues Joseph should receive in this case. Second, the district court's sentencing decision was driven in large part by "concern over the quantity of weapons, ammunition, and body armor found at Young's home, especially when viewed in light of certain statements he had made to FBI informants about how he could protect himself from the FBI and infiltrate federal buildings." *United States v. Young*, 818 F. App'x 185, 191 (4th Cir. 2020).°

No similar facts are present here. There was no evidence at trial that Joseph had or intended to obtain weapons of any kind, nor that he intended to attack any federal installations in the United States or elsewhere. In fact, when the Government's agents proposed an attack or weapons training, Joseph declined. This is a significant point, as Dr. Sageman explains in EXHIBIT 5 (letter dated 7/13/2020).

*United States v. Robert Hester* (W.D. Mo., March 4, 2020, 17-CR-64). The defendant in this case was convicted of material support for terrorism and sentenced to 236 months based on far more egregious conduct than Joseph here. Among other things, Hester "was planning on bombing a Kansas City bus station with people he believed were members of ISIS." *Columbia terror suspect sentenced to nearly 20 years in prison*, ABC News (March 4, 2020).°

Unlike Hester, the evidence here clearly established that Joseph thought the people he was helping were engaged only in conflict oversea, and there

was no evidence that he knew of or planned to participate in any attacks within the United States. Rather, Joseph's initial impulse was to offer to donate clothes for children. The idea for the crime came from federal agents, not Joseph, and it was federal agents who asked for phones for detonators. This is a material distinction from cases like *Hester*, where it was the defendant himself who came up with the idea of an attack against a bus station.

*United States v. Ahmed Mohammed El Gammal* (S.D.N.Y., February 17, 2019, 15-CR-588). This case also involved significantly more egregious conduct, but led to a sentence of 144 months, well below what the Government seeks here. In that case, the defendant personally recruited an individual to fight in Syria for ISIS and facilitated his travel. More importantly for sentencing purposes, that defendant attempted to cover up his social media posts and encouraged others to do the same. In contrast, Joseph here did not recruit—much less even approach—the undercover informant, nor did he make any efforts to hide or cover up his beliefs online. In fact, Joseph was quite clear that he was troubled by many of ISIS' violent attacks. Further, it bears noting that the defendant received only 12 years despite being convicted of multiple counts, unlike Joseph, who was convicted on only a single conspiracy count.

*United States v. Ali Shukri Amin* (E.D. VA., August 28, 2015, 15-CR-164). This case significantly undercuts the Government's request for a 17-year sentence, given that the defendant received a sentence of only 11 years for similar conduct, such as securing a ride to the airport for a traveler to join ISIS. Moreover, Amin's sentence was later reduced to only six years due to his cooperation with the Government. In this case, while Joseph never

had a formal cooperation agreement with the Government, he was cooperative with them; he simply had no information to give against anyone other than the FBI agents themselves.

Far more useful than the cases cited by the Government is the sentencing analysis in *United States v. Jumaev*, 2018 U.S. Dist. LEXIS 119916 (July 18, 2018 D. Colo.).° As the sentencing judge summarized, the defendant wrote a single check for $300 to the Islamic Jihad Union, which never reached the IJU or any other terrorist organization, and had no specific plot or plan, never committed an act of violence, and never advocated for any specific violent act. *Id.* at *1-2.° After rejecting the guidelines as overly harsh for the same reasons Joseph advocates here (*see id.* at *27-34)°, the court examined no less than 15 other cases involving material-support convictions (and included an extensive appendix listing numerous others), the court found that a sentence of 76 months, effectively time served, was adequate based on the facts of the case.

*Jumaev* is also particularly useful here because of the extensive appendix that the sentencing judge included with the sentencing opinion, which charts the sentence in every known material-support case. *See* Exhibit 1. Several other recent cases also bear mentioning. In *United States v. Ludke*, No. 16-CR-175 (E.D. Wisc. 2019), the defendant "went to great lengths to try and join ISIS, cutting the bracelet he was wearing because of federal supervision, and traveling over the course of days to Texas to try to cross to Mexico to try to fly to the Middle East to join ISIS." This went so far as attempting to have an FBI agent, who stopped him from joining ISIS, murdered. Even without enhancements, the defendant had a

criminal history category VI. *See generally* Exhibit 2 (*Ludke*, sentencing transcript [108] at 11-13).

The sentencing judge also extensively discussed the policy problems with the terrorism guidelines, which is discussed above in Section 2. Ultimately, even with these nearly every sentencing factor weighing against him, Ludke was sentenced to only 84 months. *See* Exhibit 2, at 29:20-22. Yet the Government seeks many times that sentence for Joseph here, while the history and characteristics of the two could not be more different.

Another example is *United States v. Khan*, No. 4:15-cr-263 (S.D. Tex.). *See* Exhibit 3 ([109] resentencing transcript). In this case, Khan travelled to Syria, and induced a friend to travel with him, using connections to actual terrorists, unlike Joseph's contact with only undercover FBI agents in this case. Even with actual, personal travel, Khan received only 18 months, compared to the 180 months sought by the Government.

Then there is *United States v. Ceaser*, Nos. 1:17-cr-48, 1:19-cr-117. According to the Government, the defendant in that case was a "a committed recruiter and self-described 'assistant' to the terrorist group, connecting ISIS supporters in the United States to ISIS facilitators and operatives abroad.... Specifically, the defendant repeatedly used numerous social media accounts and other electronic communication platforms to proclaim her support for ISIS and violent jihad, to recruit for ISIS and to attempt to help others join and fight for the group." *Ceaser*, [101] at 2°. Worse, while "on bail before sentencing, despite explicit orders from the Court not to do so," she re-connected with other ISIS supporters and then attempted to cover up evidence of her bail violation by deleting her communications. *Id.* at 3. The result, even with all of that, was a sentence of

only 48 months. *See Ceaser*, [117] (amended judgment order)°. Joseph has already served more time than that.

Another case of note is *United States v. Naidu*, No. 1:08-cr-00091-CCB-2 (D. Md.). The defendant in this case was sentenced to 57 months. *See Naidu*, [70] (judgment)°. The Government had sought 180 months because the defendant had made numerous trips abroad to facilitate weapons purchases for a terrorist organization, met with terrorist financiers and leaders, and organized a $900,000 arms deal. Exhibit 4, *Naidu*, [99] at 5-9, 35-39 (sentencing transcript). Joseph did nothing of the sort. In fact, he didn't even have a passport.

Two recent cases from this district are also illuminating. In one, *United States v. Al-Jayyab*, No. 1:16-cr-181 (N.D. Ill.), the defendant not only personally travelled overseas but also actually fought before returning to the United States. *See Al-Jayyab*, [129] ¶ 6 (plea agreement)°. Judge Ellis sentenced him to 60 months. *See Al-Jayyab*, [154] (judgment)°. In another, *United States v. Khan*, No. 1:14-cr-564 (N.D. Ill.), the defendant attempted to travel to Syria to join ISIS along with two minors whom he brought with him but was stopped by law enforcement at O'Hare International Airport. *See Khan*, [81] ¶ 6 (plea agreement)°. Judge Tharp sentenced him to 40 months. *See Khan*, [101] (judgment order)°.

## 4. Racial disparities in sentencing

Joseph is African American, a fact which cannot be ignored when considering a sentence which is sufficient, but not greater than necessary to accomplish the goals of sentencing. In November 2017, the U.S. Sentencing Commission published *Demographic Differences in Sentencing: An Update to the 2012 Booker Report*,° which found that black male offenders continue to

receive sentences that are approximately 20% higher than similarly situated white male offenders, after controlling for a wide variety of other sentencing and demographic factors. The report's key findings note that this trend remains unchanged in recent years:

### Key Findings

Consistent with its previous reports, the Commission found that sentence length continues to be associated with some demographic factors. In particular, after controlling for a wide variety of sentencing factors, the Commission found:

• **Black male offenders continued to receive longer sentences than similarly situated White male offenders.** Black male offenders received sentences on average 19.1 percent longer than similarly situated White male offenders during the Post-Report period (fiscal years 2012-2016), as they had for the prior four periods studied. The differences in sentence length remained relatively unchanged compared to the Post-*Gall* period.

• **Non-government sponsored departures and variances appear to contribute significantly to the difference in sentence length between Black male and White male offenders.** Black male offenders were 21.2 percent less likely than White male offenders to receive a non-government sponsored downward departure or variance during the Post-Report period. Furthermore, when Black male offenders did receive a non-government sponsored departure or variance, they received sentences 16.8 percent longer than White male offenders who received a non-government sponsored departure or variance. In contrast, there was a 7.9 percent difference in sentence length between Black male and White male offenders who received sentences within the applicable sentencing guidelines range, and there was no statistically significant difference in sentence length between Black male and White male offenders who received a substantial assistance departure.

U.S. Sentencing Comm'n, *Demographic Differences in Sentencing: An Update to the 2012 Booker Report* (2017).°

Any discussion of Joseph's criminal history is incomplete unless it is also discussed through the lens of his race. Often overlooked in sentencing determinations are two important and intertwined factors: the "adultification" of African American children and the over-policing of

African American communities, which have been shown to lead to high levels of African American teens with multiple arrests for petty offenses, such as gambling, trespassing and low-level marijuana possession prior to reaching adulthood.

Michelle Alexander examined mass incarceration and institutional racism in *The New Jim Crow: Mass Incarceration in the Age of Colorblindness*, which focused on the "war on drugs":

> Vast numbers of people are swept into the criminal justice system by the police, who conduct drug operations in primarily poor communities of color. They are rewarded in cash—through drug forfeiture laws and federal grant programs—for rounding up as many people as possible, and they operate unconstrained by constitutional rules of procedure that were once considered inviolate. Police can stop, interrogate, and search anyone they choose for drug investigations, provided they get "consent." Because there is no meaningful check on the exercise of police discretion, racial biases are granted free reign. In fact, police are allowed to rely on race as a factor in selecting whom to stop and search (even though people of color are no more likely to be guilty of drug crimes than whites)—effectively guaranteeing that those who are swept into the system are primarily black and brown."

*Id.* at 185. This book, while nearly ten years old, paints an all too familiar picture of Chicago on the following pages. African American communities remain inundated with a disproportionate number of Chicago Police officers fighting the "war on drugs," using the "broken windows" theory of policing. Small issues, like gambling or trespassing, have been increasingly treated as problems that can only be dealt with in court, which begins a cycle of arrests and the creation of a lengthy criminal history for behavior that is not particularly serious, especially in teens.

Joseph's early arrests are a textbook picture of the adultification of a black child. As early as 16, Joseph was being swept into the criminal justice

system, not for serious offenses, but for such minor offenses as trespass, disorderly conduct, consumption of alcohol by a minor, possession of cannabis (now not even a crime). The vast majority of even his later offenses are relatively run-of-the-mill, involving driving without insurance, driving without a license, failure to report an accident, and DUI.

"Research has shown that Black boys, in particular, are often perceived as less innocent and more adult than their white male peers and, as a result, they are more likely to be assigned greater culpability for their actions, which increases their risk of contact with the juvenile justice system. This report refers to this phenomenon, which effectively reduces or removes the consideration of childhood as a mediating factor in Black youths' behavior, as 'adultification'." Georgetown Law Center on Poverty and Inequality, *Girlhood, Interrupted: The Erasure of Black Girls' Childhood* (2017).° The effects of adultification of African American boys is that they are more likely to come into contact with the police at a young age, and face harsher punishments than their white peers, including police violence, when that contact occurs. (*See* American Psychological Association, *Black Boys Viewed as Older, Less Innocent Than Whites, Research Finds* (Mar. 6, 2014).°

In response to the long history of institutional racism in the Chicago Police Department, the Illinois Attorney General sued the City of Chicago in the wake of the Laquan McDonald shooting, demanding reforms in the way that the Chicago Police engage with the African American community. On January 31, 2019, Judge Dow entered a consent decree which details necessary changes that the Chicago Police Department must make. *See State of Illinois v. City of Chicago*, 17 CV 6260, Dkt. 702.° This decree is the result of multiple reviews of the Chicago Police Department's practices over

the past fifty years, which demonstrates patterns of policing that disproportionally harm the African American and Latino citizens of Chicago, and thousands of public comments, which are detailed in Judge Dow's memorandum opinion and order.

The decree specifically addresses the needs for anti-bias training (pg 22, para 72) and orders CPD to fundamentally change the way they deal with juveniles. Pursuant to the decree, officers must make every effort to divert juveniles away from the criminal justice system. (pg 8, para 33). This change is in direct recognition that African American juveniles are disproportionally swept into the criminal justice system at disturbingly young ages, and that this practice cannot continue.

In any consideration of his criminal history, Joseph should not be held to a standard that is being abandoned in the face of evidence that African American children are disproportionally punished as adults.

## 5. History and characteristics of the defendant

### 5.1. Early years

Joseph was born at the Fort Sill army base in Lawton, Oklahoma. He is the second of three children born to Wayne and Bernetta Jones.

Joseph's father served in the U.S. Army, eventually retiring as a staff sergeant. Growing up, Joseph's family was extremely close knit. They attended Baptist churches, including regular Bible-study classes. Although his dad was well respected, Joseph still experienced racism while growing up on military bases. He recalls one incident at Fort Bliss, Texas, when he was around seven years old. His dad was away on a training exercise and Joseph was playing hide and seek with other kids outside an apartment building on the base. A white soldier came out of the apartments and

physically assaulted Joseph, screaming racial epithets at him while manually strangling him until Joseph lost consciousness. Joseph told his mom, and the Military Police were called, but Joseph does not know what happened to the white soldier. This traumatic incident left a deep impression on Joseph.

While his dad was in the Army, Joseph attended and excelled in schools on the Army bases. He was challenged by the materials being taught and rose to the occasion. He loved school and had many friends, though friendships were hard for children to maintain when enlisted parents moved from base to base every few years, so he lost touch with his friends each time the family moved. He enjoyed a diverse community and student body during his dad's army years.

Joseph was a curious kid—throughout his life he would engage in deep debates with his dad on a variety of subjects. When Joseph wanted to know more about a subject, his dad would "assign" essays and they would discuss what he'd written. When Joseph's family moved to North Chicago, it was the first time he'd lived in a community with a majority Black population. Even so, he still experienced bullying over his southern accent, lack of familiarity with local slang and gang customs, and his intelligence. His world became much less safe because he and his brother were ignorant of local gang territories and culture. He describes his adjustment to living in North Chicago as "culture shock"—he had no frame of reference for the new community he lived in, which made him feel alienated and alone.

He quickly realized that the materials being taught in the Joseph schools were years behind the materials he'd learned in Army schools, so he became bored repeating the same information. He also experienced significant

safety risks getting to and from school. His school was in Gangster Disciples territory, and Joseph and his brother often had to fight to keep their shoes, jackets, and other possessions from being stolen on the way to and from school. The Gangster Disciples members saw that Joseph and his brother had nice things and would beat them to try and steal the clothes from their backs. He began associating with the Black P-Stones gang out of necessity. He needed protection from the Gangster Disciples, and the Black P-Stones provided it.

### 5.2. His father's descent into addiction

After their move to Joseph, Joseph's parents were also struggling and their relationships with their children, while still loving, were becoming complicated. Joseph's dad was deployed to the Middle East during the Gulf War in the early 1990s. He came home with deep emotional scars and suffered from severe Post-Traumatic Stress Disorder, which took a long time to diagnose. Due to his PTSD, his father left the Army in 1993, when Joseph was eleven. His father disassociated and had persistent nightmares, and although he was treated at the Veteran's Administration, he did not get much relief from his symptoms. Eventually, Joseph's dad began using heroin as a coping mechanism.

His parents' marriage became rocky, and Joseph understood that something was wrong, though he didn't understand the details at the time. His parents sought help through their church, but during the worst of his dad's addiction, Joseph's dad would often move out of the house for several months at a time. These separations relieved the pressure of living with him while his addiction was at its worst, but his dad's absence and addiction took a toll on his mom, causing her to become depressed.

Joseph's dad showed Joseph and his brother the gun he'd purchased for home protection and showed them how to use it to protect their house before he'd leave for months at a time, putting the burden of protecting their mom and sister on the two young teen boys. When Joseph's dad was living at home, strangers would come to the house at all hours of the day and night as part of his drug activities. Joseph's dad felt that when he was gone, it was Joseph's and his brother's duty to protect the family.

### 5.3. Joseph's own troubles begin

When Joseph was 15, his dad finally admitted that he was addicted to heroin, which explained his erratic behavior and the strife in his parents' marriage. Around this time, Joseph himself began smoking marijuana after catching his dad smoking marijuana in the backyard of their home.  He began skipping school to smoke and hang out with friends because he felt lost. He felt like his family was falling apart while his dad was in and out of the home; that making it to a school that wasn't educating him wasn't worth the danger of being attacked by gangs on his way there; and that his church wasn't helping his dad overcome his addiction, despite his mom's increased attendance and requests for help from the church community.

Joseph began spending more time on the streets with his friends and started getting arrested. His relationship with his parents was increasingly fractious—Joseph felt that his mom favored his brother because she would attend his brother's games and high school events and would buy things for his brother like a letterman jacket, when she didn't come to his games or buy him the same things.

He also argued with his parents about his future. Joseph attended the Talent Search program, where he had the opportunity to go on college visits

in Iowa. His parents, however, were pressuring him to enlist in the Army.
Joseph wanted to attend college first and then join the military as an officer.
His parents didn't understand that financial aid was available and thought
that the only way he could pay for college was by enlisting and using the GI
Bill to pay for his education.

### 5.4. Joseph hits rock bottom

These disagreements, coupled with the pressure from his parents' rocky
marriage, caused a rift in the family. When Joseph was 16, his father kicked
him out of the house and took away his house key. Joseph began stealing
and selling crack to support himself. He lived in an abandoned house that
had no heat in the winter with another man. He paid "rent" to this man in
crack, just to keep a roof over his head.

During this time, Joseph did what he needed to do to survive on his own,
including engaging in escalating criminal behavior, and eventually he was
incarcerated. While he was in prison, he began repairing his relationship
with his mom and they became very close. He got drug treatment while he
was in prison, though he felt that he didn't get much benefit from it because
he was not in the right frame of mind to make the most of the program.

After his release, Joseph started partying with his friends. He'd turned
21 in prison and wanted to celebrate his freedom and adulthood by going out
to clubs and bars. He began abusing alcohol and continued getting in
trouble, even though he was working and trying to get back into school. He
was selling drugs to make ends meet and continued to struggle with alcohol
and marijuana abuse.

### 5.5. Joseph begins to turn his life around

Joseph met Jameka Leonard, who was a friend of his sister, in 2004. She was four years younger than Joseph, but they developed a strong connection, and she became pregnant with his oldest daughter in 2006.

When Joseph found out that Jameka was pregnant, he stopped selling drugs. He felt for the first time that it was time for him to change his life. He didn't want to leave his daughter without a father, so he began seeking out ways to better himself and reduce his reliance on marijuana and alcohol. Joseph's life stabilized in 2007 when Jassiah was born. He wanted to be the best father he could be, so he focused on his family and turned his back on the life he'd been leading.

This period of stability didn't last, however. Jameka was involved in a car accident in 2008, and when she was given a CT scan to make sure she didn't have a concussion, the doctors found a brain tumor. After the tumor was diagnosed, Jameka began drinking heavily. Joseph soon realized that Jameka's drinking had become a problem and their relationship ended when it became too painful for him to watch her continue to hurt herself with alcohol.

Even though they were no longer together, Joseph and Jameka remained close. They co-parented Jassiah, and she was a great mom. Joseph took care of Jameka during her recovery from a surgery to put a shunt in her brain in 2010. In 2011, Jameka's health took a turn for the worse and she was diagnosed with cancer. Joseph spent a lot of time with Jameka and Jassiah, becoming Jassiah's primary caregiver as time went on and Jameka's illness got worse. Eventually, Jassiah went to live with Joseph full time so that

Jameka could focus on her own health. Jameka passed away in 2016, leaving Joseph as Jassiah's only parent.

### 5.6. Islam is a catalyst for positive change in Joseph's life

Around the same time that Joseph became a father, he first discovered Islam. He was struggling with alcohol and marijuana use at the time and knew that he needed to get his life together so he could take care of his daughter. Joseph met a white man whom he'd observed praying and became curious about Islam.

Joseph did what he'd always done as a child when he became curious about a subject—he went to the library and started his research, while also talking to friends and family to learn more. He checked out "The Idiot's Guide to Islam" from the Waukegan library and stayed up all night reading it because the information really spoke to him.

The next day he was filled with contradictions—he'd been raised in the Baptist church, but the teachings of Islam resonated with him. He decided to go to a Baptist church to seek advice. When he shared that he was questioning his faith and that he'd been reading about Islam, his questions were not well received. Instead of advice, he felt the church rushed to judge him and castigate him for his research into Islam.

Joseph began identifying himself a Muslim and praying, but he was still smoking marijuana and drinking. During a conversation with his dad about Islam, his dad called him out on this contradiction, challenging him to live like a Muslim by quitting drinking and smoking. While he didn't quit overnight, he felt that his dad's challenge and his continued independent study into Islam helped put him back on the right path toward eventual sobriety.

### 5.7. Joseph stabilizes his life

Around 2010, Joseph met Keara Smith. His cousin had convinced him to go to a bar for the evening, though Joseph didn't really want to go. He noticed Keara, who also seemed like she was reluctant to be at the bar with her friends, and he struck up a conversation with her. They started talking and bonded over the fact that neither of them wanted to be hanging out in a bar that night.

Keara had a young son from a previous relationship, Karon, whom Joseph met when he was three. Since that time, Joseph has been Karon's primary father figure. Karon's biological father is involved in his life but



only tangentially. Joseph and Keara's relationship blossomed, and they were married on July 23, 2011. They have two children together, Yusayrah and Yasir.

Joseph is very close to all his children. He volunteered to coach Jassiah and Karon's basketball team and was their primary caretaker before his arrest. He began feeding homeless people in Waukegan and recruited his kids to help him make and deliver packed lunches. They made sandwiches, packed lunch bags, and went to places where homeless people congregated to deliver the lunches as a family. He wanted to help his community and teach his kids to live a life of service to others and gratitude for what they have.

### 5.8. Joseph seeks guidance in living his faith in Islam

The factors that primed Joseph to be particularly susceptible to the influence of the Government's agents in this case were formed over his entire lifetime.

During the early years of his conversion to Islam, Joseph felt like he was the only Muslim in the world. He was reading everything he could get his hands on but wasn't connected to a mosque or any community organizations who could guide him in his quest for knowledge. He sought books, articles, and did internet research to learn as much as he could.

Around 2008, Joseph found a small storefront mosque in Waukegan and began attending prayer services. This mosque was associated with a much larger mosque in the suburbs, but couldn't offer many of the services, like new member classes, that the larger suburban mosque offered. Joseph couldn't drive himself to the larger mosque and there was no public transportation to this suburb, so Joseph continued his religious education largely on his own.

Even when Joseph began attending the larger mosque, he still lacked guidance and community. He felt that he couldn't ask the leaders his questions unless he was at the mosque for services, and that while most of the members attended Friday prayer services, they weren't interested in mentoring new members or deeper community participation. Despite this lack of guidance and isolation, Joseph credits Islam for helping him get clean because he had to be sober to properly perform his daily prayers. It helped him realize that he had to stop associating with his old friends, because they weren't supportive of his sobriety.

Joseph was alienated from his community—first by the personal and systemic racism he experienced as a Black man in the United States, and later in the lack of guidance from the local Muslim community. Joseph is a seeker of knowledge and information. He wants to understand the world around him and to use that understanding to better life for others.

When he began his research into the Arab Spring events in the Middle East, he was interested in the power of oppressed people to overthrow brutal government regimes that had existed for decades in Egypt, Tunisia, and Syria. While studying at Harold Washington College, his class was assigned an essay to write about a controversial topic. Joseph chose the subject "Should Arabs be allowed to form an Islamic state?", which argued that, like the Jewish state of Israel, people in Middle Eastern countries should have the freedom and self-determination to choose a government based on Islamic laws and principles.

Joseph began his research with mainstream media sources, like CNN and articles in the *New York Times*. He read about the horrors that the Assad regime was inflicting on the people of Syria and felt passionately that the Syrian people desperately needed help. As he continued researching, he sought out information in chat rooms and alternate news sources because he wanted to get all sides of the story. He sought the truth of the situation, not just one perspective.

This quest took him to dark places on the internet, and he read and saw many things that he strongly disagrees with. He abhors violence against civilians—that includes attacks against people in the United States, Syria, and anywhere else in the world. He believes that Islam never justifies violence against people who are just trying to live their lives.

As Joseph dug further and further into the internet's vast compilation of content, he discovered ISIS recruitment videos. These videos are slick, professional propaganda pieces that present ISIS as combined humanitarian organization and liberating army. Civilians are fed, clothed, and treated for injuries inflicted by the Syrian Army. Fighters engage Syrian troops. Joseph felt a deep sympathy, not for the ISIS fighters, but for the civilian victims of the war. He disagreed with many of ISIS' positions, he but felt that they were the only group doing something to help civilians while the rest of the world sat by and watched Syria burn. He felt called to help ease the suffering of the civilian victims, not to fight for ISIS.

Joseph's online research led him to become a participant in active debates. Throughout his life, he and his dad had researched and debated topics, so this felt like a natural extension of a lifetime habit to Joseph. But it was these online debates that brought him to the Government's attention. Over two years, the Government preyed on Joseph's faith, his experiences of racial discrimination, his sense of alienation from his community, and his empathy for the suffering of the Syrian people, and slowly but inexorably dragged him into the events that landed him here in federal court.

Joseph feels betrayed by the Government. He was raised to respect the government but feels like they pressured him into something he didn't want to do, even going so far as to attempt to break up his marriage. FBI Special Agent Cartwright told Keara that Joseph had cheated on her, causing Keara to seek an order of protection because Karon's paternal grandma took him when Joseph was arrested. Joseph got a lawyer to get him back, and her lawyer told her to get the OP to get custody of Karon. Yet Joseph was never abusive toward Keara. Nor was this the only personal tragedy that Joseph

has suffered while imprisoned in this case. His father died while Joseph was in jail, and he didn't get to say goodbye or to attend his funeral.

### 6. Deterrence does not require a lengthy sentence

The Seventh Circuit has noted that sentencing courts should be aware of the concept of marginal deterrence, that is, "that the harshest sentences should be reserved for the most culpable behavior". *United States v. Newsom*, 402 F.3d 780, 785-86 (7th Cir. 2005)°. Failing to consider this issue in crafting a sentence all but ensures that there will be little room left at the top of the sentencing curve for those who inflict the greatest harms on society. *Id.*

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006).° "Three National Academy of Science panels. . . reached that conclusion, as has every major survey of the evidence." *Id.*;° *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007)° ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999).° The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id.* at 1.° It examined the effects of changes to both the certainty and severity of

punishment. *Id.*° While significant correlations were found between the certainty of punishment and crime rates, "the correlations between *sentence severity* and crime rates . . . were not sufficient to achieve statistical significance." *Id.* at 2° (emphasis added). The report concluded that the studies reviewed do not provide a basis for inferring that increasing the severity of sentences correspondingly increases deterrent effects. *Id.* at 1.°

More recently, in May 2016, the U.S. Department of Justice's National Institute of Justice published a fact sheet entitled "Five Things About Deterrence", which summarized the research that has been done on deterrence. Three of the key findings include: (1) "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment"; (2) "[s]ending an individual convicted of crime to prison isn't a very effective way of deterring crime; and (3) "[i]ncreasing the severity of punishment does little to deter crime." *Id.*; *see also generally* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Justice 199-263 (2013).°

This conclusion is borne out in the U.S. Sentencing Commission's March 2016 report, *Recidivism Among Federal Offenders: A Comprehensive Overview.*° Among the report's key findings is that "with the exception of very short sentences (less than 6 months), the rate of recidivism varies very little by length of prison sentence imposed (fluctuating between 50.8% for

> Offenders with shorter lengths of imprisonment generally had lower recidivism rates. For instance, offenders with sentences of imprisonment of fewer than six months had the lowest rearrest rate at 37.5 percent, followed by offenders with sentences from six to 11 months (50.8 percent), and 12 to fewer than 24 months (50.8%). Conversely, the highest recidivism rates are generally found among offenders with longer sentences. Those with sentences from 60 months to fewer than 120 months had the highest rate (55.5%), followed closely by those with 24 to fewer than 60 months (54.0%), and 120 months or more (51.8%).[55]

sentences between 6 months to 2 years, to a high of 55.5% for sentences between 5 to 9 years)." Importantly, a longer sentence of imprisonment makes a defendant *more* likely, not less likely, to reoffend. The study noted: *Id.* at 22.° A sentence of time served (46 months) in this case would adequately satisfy the goal of deterrence.

### 7. A fine is not appropriate

The guidelines note that the Court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." USSG § 5E1.2(a).° Joseph has no present income and thus has no ability to pay a fine. His income once released is uncertain, and it is unlikely that he will become able to pay a fine in the future. Consequently, the defense requests that the Court decline to impose a fine.

Respectfully Submitted,

/s/ James G. Vanzant
Attorney for Defendant

James G. Vanzant
Holly N. Blaine
Blaine & Vanzant, LLP
922 Davis Street
Evanston, Illinois 60201
Tel.: (312) 788-7584
E-mail: jgv@blainevanzant.com°
E-mail: hnb@blainevanzant.com°

Patrick E. Boyle
Law Office of Patrick E. Boyle
155 N. Michigan Ave, Ste 562
Chicago, IL 60601
Tel.: (312) 565-2888
E-mail: privpat3@hotmail.com°