**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 17-cr-00236 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| JOSEPH D. JONES and EDWARD | ) | |
| SCHIMENTI | ) | |

## MEMORANDUM OPINION AND ORDER

Joseph Jones and Edward Schimenti (together, "Defendants") were the subjects of a Federal Bureau of Investigation ("FBI") investigation lasting more than two years that involved several undercover agents and a fictitious terrorist network claiming association with the Islamic State in Iraq and Syria ("ISIS"). Both Defendants subsequently were indicted on charges of conspiring to provide material support to a terrorist organization—specifically, trying to provide equipment and personnel to ISIS—in violation of 18 U.S.C. § 2339B(a)(1). Schimenti was also charged with knowingly making materially false statements to the FBI involving international terrorism, in violation of 18 U.S.C. § 1001(a)(2), based on his post-arrest interview. A jury convicted Defendants of all charges. Defendants now seek judgments of acquittal pursuant to Federal Rule of Criminal Procedure 29 or, alternatively, a new trial pursuant to Federal Rule of Criminal Procedure 33. (Dkt. Nos. 248, 249.) For the following reasons, the Court denies Defendants' motions.

## BACKGROUND

Jones and Schimenti, two childhood friends residing in the Chicago area, were found guilty after a jury trial of providing material support to a terrorist organization, namely, ISIS, in violation of 18 U.S.C. § 2339B(a)(1) ("Count One"). Schimenti was also convicted of knowingly making materially false statements involving international terrorism to the FBI during his post-

arrest interview, in violation of 18 U.S.C. § 1001(a)(2) ("Count Two"). In considering their post-trial motions pursuant to Rules 29 and 33, the Court begins with an overview of the trial.

Jury selection in this case began on May 28, 2019 and continued through May 31, 2019. Two and a half weeks later, the parties gave closing arguments. In between, the jury heard testimony from 15 witnesses and saw more than one hundred exhibits admitted into evidence. The witnesses included: Jamil Jaffer, an expert on terrorism; Cassandra Carnright, the FBI case agent for the investigation; Hamath Muhamad, a congregant at Defendants' mosque; Kelly Turnipseed, Schimenti's ex-girlfriend; Abdulhakeem (pseyduonym), an undercover FBI agent; Bilal Sharif (pseudonym,) an undercover FBI agent; Muhamed, the FBI's confidential human source;[1] Rateesha Darden, Jones's former girlfriend; Victor Rodriguez, an FBI explosives expert; Thad Boertje, an FBI agent who interviewed Schimenti following his arrest; Marc Sageman, a terrorism expert retained by Defendants; J'Laine Johnson, Schimenti's aunt; Bernetta Jones, Jones's mother; Keara Jones, Defendant Jones's wife; and Joseph Jones, testifying in his own defense. Among the exhibits accepted into evidence were numerous covert recordings of Jones and Schimenti interacting with individuals who unbeknownst to them were working with the FBI as undercover agents and informants. The jury both heard the recordings and were provided transcripts of the conversations. After considering this evidence during two days of deliberations, the jury returned its guilty verdicts on June 20, 2019.

## I. Testimony from Government Agents

Several FBI agents testified at trial regarding the investigation that led to the indictment of Jones and Schimenti. The first agent to testify was Cassandra Carnright, an FBI agent

---

[1] Generally, a "confidential human source" is a civilian undercover source (like a confidential informant) who works with the FBI but is not an FBI agent.

assigned to a counterterrorism squad focusing on "homegrown violent extremism inspired by ISIS."[2] (Trial Tr. ("Tr.") 250.) Carnright was a "source handler" of the FBI's confidential human source, Muhamed, and eventually served as the "case agent" for the investigation—that is, the person responsible for the overall management of the investigation. (Tr. 252.) Her testimony provided an overview of the FBI's investigation, which began as a result of online postings by Jones and Schimenti that promoted violence and expressed support for ISIS. (Tr. 253–319.) The FBI surveilled Jones and Schimenti and sent undercover employees and Muhamed, the confidential human source, to engage them. (Tr. 319–20.)[3]

Carnright testified regarding numerous recordings between the undercover agents and Defendants. The first undercover agent, "Omar" (a pseudonym), was introduced to Jones at a police station. (Tr. 321.) Omar pretended to be a devout Muslim who was being detained for transporting cigarettes across state lines. (*Id.*) Jones formed a friendship with Omar, shared ISIS videos with him, and asked to be connected with other "brothers." (Tr. 323.)

Subsequently, the FBI introduced Jones to another undercover agent, "Bilal." (Tr. 328.) On October 30, 2015—about two months after Jones met Omar at the police station—Jones and Schimenti met in person with Bilal and Omar. (Tr. 328–29.) In mid-December 2015, the FBI received a false allegation that Schimenti was involved in a terrorist attack in Switzerland; in response, the FBI interviewed Schimenti and Jones and imaged Schimenti's home computer. (Tr. 330–31.) Soon thereafter, on December 29, 2015, Jones, Schimenti, Omar, and Bilal met again.

---

[2] Because Carnright provided an overview of the entire FBI investigation, the Court describes her testimony in greater detail than that of other witnesses. Nonetheless, in ruling on Defendants' motions, the Court reviewed the entire record and bases its decision on the entirety of the evidence at trial, not just the sections excerpted here.

[3] The FBI distinguishes between undercover employees and "online covert employees." But both are FBI agents assuming false identities and for purposes of this opinion the Court refers to both as undercover agents.

Omar and Bilal asked Jones and Schimenti about pledging allegiance to ISIS; in response, Schimenti became visibly upset and left the meeting. (Tr. 332.) As Bilal later testified at trial, Jones ended up leaving the meeting with Schimenti, but he also asked Omar and Bilal to keep in touch with him. (Tr. 1006.) And Omar and Bilal did keep in touch with Jones. Ultimately, Omar told Jones that he would be traveling to join ISIS with Bilal's help. (Tr. 333.) This, of course, was not true. But the FBI wanted to establish Bilal as a "facilitator" who could help people travel to join ISIS and also determine whether Jones was interested in traveling to support ISIS. (*Id.*) Before he left for his "travel" to support ISIS, Omar delivered an ISIS flag to Jones, who kept it in his home. (Tr. 349–51.)

After Omar "traveled" to join ISIS, Jones came into contact with another undercover FBI agent, also going by the name "Omar" ("Omar 2") (Tr. 351.) Jones told Omar 2 that there was a "ferry getting brothers to the land of truth near us" and that "[s]ome brothers made hijra in May," referring to Bilal helping Omar to travel to support ISIS. (Tr. 353.) Jones introduced Omar 2 to Bilal so that Omar 2 could also travel to support ISIS. (*Id.*)

The FBI also introduced Muhamed to Schimenti. (Tr. 402.) Muhamed obtained a job with Schimenti's employer, spoke with Schimenti at work, and began meeting with Schimenti outside of work in December 2016. (Tr. 413–18.) Shortly thereafter, Muhamed began establishing a "legend" (that is, a fake backstory), which was that he had a brother named Ahmed who lived in Syria to fight for ISIS. (Tr. 419–20.) Muhamed eventually told Schimenti that he wanted to travel to fight for ISIS with his brother, and Schimenti offered to help. (Tr. 421–22.) Muhamed told Schimenti that he needed cell phones that ISIS fighters would use to avoid drone strikes and to create improvised explosive devices. (Tr. 424–26.)

In late February 2017, Schimenti introduced Muhamed to Jones. (Tr. 426.) Schimenti described Jones to Muhamed as a "trusted brother" who had "helped two other brothers travel overseas." (Tr. 427.) Both Schimenti and Jones obtained phones to give to Muhamed. (Tr. 438–47.) The evidence at trial showed that Schimenti and Jones both understood that the phones would be used for bombs. (*Id.*) Jones introduced Muhamed to Bilal to facilitate Muhamed's travel to fight for ISIS. (Tr. 437–38.) On April 7, 2017, Schimenti, Jones, and Muhamed met for a final meal. (Tr. 447.) Then, they dropped Muhamed off at the airport, where they understood he would travel to Syria to support ISIS. (*Id.*) Schimenti asked Muhamed to send him a video of him killing someone when he arrived. (*Id.*) Five days later, on April 12, 2017, Jones and Schimenti were arrested. (Tr. 448.)

Bilal testified at trial consistently with the above. (Tr. 976–1072; 1112–90.) He also discussed in greater detail the meeting on December 29, 2015, when Bilal, Omar, Jones, and Schimenti met in a hotel room. (Tr. 990.) According to Bilal, he and Omar showed Jones and Schimenti a video of Omar training to shoot guns in desert conditions. (Tr. 991–92.) Bilal told Defendants, "If you want to rock out right now, we gonna rock out right now." (Tr. 998.) Bilal testified that the purpose of this statement was to offer to help Jones and Schimenti with anything they might be planning, but not to ask them to do anything. (Tr. 999.) At the meeting, Jones indicated that he knew Omar wanted to "shoot out to Syria" to support ISIS. (Tr. 1001–02.) When Bilal asked, "When we say who you with, you guys are on the same page, right?," Defendants responded with "alhumdulillah." (Tr. 1002.) Bilal testified that the purpose of his question was to verify that Defendants knew Bilal and Omar were ISIS facilitators, and further that the phrase "alhumdulillah" is the equivalent of a very strong "yes" among Muslims. (*Id.*) The meeting took a turn when Bilal asked, "So you know when you get into the B and

everything else," and then clarified that by "B" he meant "bay'ah," the pledge of allegiance to ISIS. (Tr. 1002–03.) Shortly thereafter, Schimenti became upset, and he and Jones left the meeting. (Tr. 1003–04, 1006.) Jones told Bilal that Schimenti thought Bilal and Omar were "all over the feds," which Bilal interpreted to mean that Schimenti thought they were FBI agents. (Tr. 1029.) As it turned out, Schimenti's suspicions were more or less correct.

Another undercover FBI agent, Abdulhakeem, also testified. (Tr. 858–974.) According to Abdulhakeem, in October 2015, he struck up a relationship with Jones online and portrayed himself as an ISIS sympathizer. (Tr. 859–65.) Eventually, Abdulhakeem offered to help Jones travel to join ISIS, writing, "I can help you. Just let me know when you are ready. The brothers, we were able to ferry thousands of people." (Tr. 899.) Jones did not take Abdulhakeem up on his offer. (*Id.*) But the two continued to correspond after this interaction. (Tr. 900–09.)

After Schimenti was arrested, he was interviewed by two FBI agents. Agent Boertje, one of the interviewers, testified at trial. A video and audio recording of the interview was submitted into evidence, and clips from the interview were played for the jury. (Tr. 1805–30.) During the interview, Schimenti was advised on multiple occasions that making false statements was a crime; he also waived his right to have an attorney present. (Tr. 1807–08.) Schimenti made several statements during the interview that other evidence showed to be false, including denying that he knew people who supported ISIS, falsely describing Muhamed's purpose for traveling, denying that he knew why Muhamed had multiple cell phones, and providing a false reason for why Muhamed had gathered the cell phones, among other things. (Tr. 1809–30.) The Government also called Victor Rodriguez, an FBI explosives expert, who testified that the cell phones Defendants gave to Muhamed could be used in the production of improvised explosive devices. (Tr. 1739–46.)

## II.    Muhamed's Testimony

Muhamed also testified at trial. He explained that he was born in Iraq and had worked for the United States Department of Defense in Iraq between 2004 and 2009. (Tr. 1220–22.) He moved to the United States in 2014 as a refugee. (Tr. 1221.) Muhamed testified that he first spoke to the FBI in the summer of 2016 when FBI agents came to his home to interview him about a report that he had an ISIS flag on his car. (Tr. 1223.) Subsequently, Muhamed followed up with the FBI, told an FBI supervisor that he loved to work with the government and was a law enforcement supporter, interviewed with the FBI, and began working as a confidential human source. (Tr. 1224–25.) Muhamed further testified that he never asked the FBI for anything in exchange for his cooperation, the FBI never offered him anything in exchange for his cooperation, and he did not expect to get anything for his cooperation. (Tr. 1225.) According to Muhamed, the FBI had given him some money but only for fuel, a cheap car, parking, and moving out from his old apartment after the case. (Tr. 1226.)

Muhamed's testimony also included more detail about how he got a job at Schimenti's workplace and built a relationship with him. (Tr. 1227–39.) Muhamed explained that he developed a "legend" as an ISIS sympathizer and told Schimenti that his brother was an ISIS member and that he wanted to travel to join his brother and fight for ISIS. (Tr. 1239–63.) He described how Schimenti responded to his desire to travel to ISIS by first telling Muhamed about Jones and Bilal and then introducing Muhamed to Jones. (Tr. 1265–67, 1281–91.) Muhamed testified that he received phones from Defendants and told Defendants that the phones would be used to make bombs. (Tr. 1308–16.) He also stated that he and Schimenti used coded language to refer to the phones, calling them "clothes" and referring to a phone store as a "clothes donation place." (Tr. 1345–46.) Muhamed specifically testified that Jones knew the phones

would be used to make bombs and was even excited that they would be used for this purpose. (Tr. 1393.) Muhamed further provided details regarding how Jones and Schimenti helped him to "travel" to Syria, culminating in giving him a ride to the airport. (Tr. 1397–1403.) Throughout his testimony, Muhamed consistently stated that he never asked Jones or Schimenti to do anything to help him.

Although almost all of the exchanges between Muhamed and Defendants were recorded (and the recordings played for the jury), a few were not. One such exchange occurred on February 6, 2017, when Muhamed told Schimenti at work that he was sad and fearful for his family and brother and that he wanted to return home to join his brother. (Tr. 1529–30.) Schimenti responded by hugging Muhamed. (Tr. 1531.) Because Muhamed did not record conversations at Schimenti's workplace, this exchange was not recorded. (Tr. 1532.) Two days later, Schimenti mentioned Jones to Muhamed for the first time. (Tr. 1533.)

### III. Expert Testimony

The Government presented expert testimony from Jamil Jaffer, a law professor and executive director of a national security think tank who teaches in national security and counterterrorism law. (Tr. 62.) Jaffer provided the jury with an overview of ISIS, including their terroristic activities, history, propaganda and recruitment strategies, and other tactics. (Tr. 75–249.) For their part, Defendants presented expert testimony from Marc Sageman, a researcher in the field of political violence and terrorism, who provided additional information on terrorism and ISIS, emphasizing the social media and online aspects of ISIS's activities. (Tr. 2048–2173.)

### IV. Jones's Testimony

Jones testified in his own defense at trial, largely acknowledging the truth of the factual allegations made by the FBI agents but suggesting that he had been entrapped by the FBI. (Tr.

2309–2693.) He testified that the FBI wore him down with their multiple attempts to solicit his involvement in providing support for terrorism. (Tr. 2340–41.) He stated that after meeting Muhamed, he felt that God must be placing these people in his life for a reason, because he kept meeting people who wanted him to support ISIS. (Tr. 2341.) Jones maintained that the FBI undercover agents and Muhamed had pressured, suggested, and asked him to materially support ISIS in various ways (including trying to travel to Syria, obtain weapons training, and facilitate the travel of others to Syria). In contrast, the Government's witnesses uniformly insisted that they never asked Defendants to do anything but only sought to uncover their intentions.

Notably, Jones also testified before the grand jury in this matter, and Boertje read substantial portions of the grand jury testimony into the record at trial. In his grand jury testimony, Jones acknowledged that he knew Muhamed wanted to go to Syria to join ISIS and that he introduced Muhamed to Bilal for that purpose. (Tr. 1782.) Jones also admitted that he provided three phones to Muhamed, one of which he gave Muhamed after he knew that the phones would be used to make bombs. (Tr. 1784.) Jones also testified that he said that he hoped the bombs would kill people and that he knew supporting ISIS was against the law. (Tr. 1784, 1800.)

### V. Post-Trial Evidence and Testimony

Also pertinent to Defendants' post-trial motions is certain evidence disclosed after trial that Defendants claim calls into question the credibility of key Government witnesses. Specifically, eight days after the jury returned its verdicts, the FBI paid Muhamed $3,000 in cash for his services. (Jones's Post-Trial Mot., Ex. 1, Expense Tracker, Dkt. No. 249-1.) Two weeks later, on July 12, 2019, the FBI paid Muhamed an additional $47,000 in cash. (*Id.*) No information regarding a potential post-trial payment had been disclosed to Defendants prior to

trial. As discussed below, Carnright has acknowledged that she considered making a request to FBI management for Muhamed to be paid earlier in the investigation, and even raised the possibility with one of the Assistant United States Attorneys on the case, but the attorney told her "to wait until after the resolution of the case." (Aff. of Cassandra Carnright ("Carnright Aff.") ¶ 4, Dkt. No. 235.) When Defendants learned of the post-trial payment, they successfully petitioned the Court to order discovery and an evidentiary hearing. At the hearing, Carnright testified that she never informed Muhamed that he would be paid for his participation in the FBI investigation until she made the first $3,000 payment. (Show Cause Hr'g Tr. 32–33, Dkt. No. 250.)

## LEGAL STANDARDS

Defendants have filed post-trial motions under both Rule 29 and Rule 33. Rule 29 requires the Court to enter a judgment of acquittal where the evidence presented at trial "is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "[A] defendant seeking a judgment of acquittal faces a 'nearly insurmountable hurdle' . . . [but] 'the height of the hurdle depends directly on the strength of the government's evidence.'" *United States v. Garcia*, 919 F.3d 489, 496–97 (7th Cir. 2019) (citations omitted). Great deference is owed to the jury's determination: "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, ***any*** rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). While the evidence is viewed in the light most favorable to the Government, Defendants need not establish that no evidence supports their convictions. *Id.* at 320. "A properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." *Id.* at 317.

Defendants have also moved for a new trial under Rule 33. Under that Rule, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. The Seventh Circuit has cautioned that Rule 33 motions should be granted only in "the most extreme cases." *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998) (internal quotation marks omitted); *see also United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (explaining that jury verdicts in criminal cases are "not to be overturned lightly."). "The court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable . . . The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989) (quoting *United States v. Martinez*, 763 F.2d 1297, 1312–13 (11th Cir. 1985).

The legal standard for granting a Rule 33 motion depends on its foundation. When a motion is based on withheld evidence, the defendant must demonstrate a "reasonable probability" that he or she would have been acquitted but for the error. *See United States v. Boyd*, 55 F.3d 239, 245 (7th Cir. 1995). The Supreme Court has defined a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). In contrast, a defendant moving for a new trial based on newly discovered evidence must show that the new evidence "probably would have led to acquittal." *United States v. O'Malley*, 833 F.3d 810, 813 (7th Cir. 2016). "[T]he 'interest of justice' requires a new trial if additional evidence (1) was discovered after trial, (2) could not have been discovered sooner through the exercise of due diligence, (3) is material and not merely impeaching or cumulative, and (4) probably would have led to acquittal." *Id.*

11

**DISCUSSION**

**I.    New Trial Based on *Batson***

Defendants first seek a new trial based on *Batson v. Kentucky*, 476 U.S. 79 (1986).

*Batson* prohibits racial discrimination in jury selection, holding that "the Equal Protection Clause

forbids the prosecutor to challenge potential jurors solely on account of their race or on the

assumption that black jurors as a group will be unable impartially to consider the State's case

against a black defendant." *Id.* at 89. Jones is Black, and Schimenti is described by his counsel as

"mixed race, and approximately one-quarter African-American." (Schimenti Post-Trial Mot. at

10, Dkt. No. 248.) During jury selection, the Government used its peremptory strikes to remove

the only two Black jurors then remaining on the venire. (Jury Selection Tr. 684, 686.)

Defendants challenged the Government's peremptory strikes pursuant to *Batson*, the Court

overruled their objections, and Defendants now claim that the ruling was an error that requires a

new trial.

The Court evaluates a *Batson* challenge to the use of a peremptory strike through a three-

step analysis: first, the defendant must make a *prima facie* showing of discriminatory motive on

the part of the prosecutor; if the defendant does so, then the prosecutor must provide a race-

neutral reason for the challenged strike; and finally, if the prosecutor provides a race-neutral

reason, the defendant must demonstrate "that the proffered justification was pretextual" or

"otherwise establish that the peremptory strike was motivated by a discriminatory purpose."

*United States v. Stephens*, 421 F.3d 503, 510 (7th Cir. 2005) (citing *Batson*, 476 U.S. at 98). "To

survive a *Batson* challenge, unlike a challenge for cause, a peremptory strike need not be based

on a strong or good reason, only founded on a reason other than race or gender." *United States v.

Brown*, 34 F.3d 569, 571 (7th Cir. 1994) (emphasis omitted).

During jury selection, Defendants contended that the Government's decision to strike the only two remaining Black jurors even though the questioning of those jurors did not elicit any obviously disqualifying facts established a *prima facie* violation. (Jury Selection Tr. 704–05.)[4] The Court agreed, and thus the burden shifted to the Government to provide a race-neutral reason for the strikes. The Government was able to do so. One of the two potential jurors had a previous negative experience with prosecutors because his brother was imprisoned and, more importantly, he had a close friend from childhood who left the country to join ISIS in Turkey and was killed there. *(Id.* at 705–06.) The other potential juror acknowledged that he had listened to an episode of the radio program "This American Life" which (according to the juror's account) discussed a government employee developing a relationship with members of a mosque and encouraging them to commit crimes. (*Id.* at 34.) The juror expressed that he found it distasteful for covert government agents to encourage Muslims to commit crimes and that he might hold a bias on that basis. (*Id.* at 35.) The juror's concerns closely tracked Defendants' entrapment theory, which was that the FBI crossed a line by encouraging them to commit crimes. The Court concluded that the Government had met its burden of providing race-neutral reasons for its strikes.

The Court then proceeded to the third step of the *Batson* analysis, where Defendants had the burden of demonstrating purposeful discrimination by the Government. The Court found the Government's explanation for striking the jurors persuasive and concluded that Defendants had not met their burden. Specifically, the Court noted that the juror who described the use of confidential sources as distasteful expressed concern about entrapment of Muslims—the exact question at issue in Defendants' entrapment defense. (*Id.* at 750.) Similarly, the Court found that

---

[4] The venire included other Black potential jurors, who were excused for cause and based on hardship. (Jury Selection Tr. 743–44.)

the Government had a sufficient race-neutral basis to strike a juror who personally knew a person who had traveled to fight for ISIS and was killed doing so. (*Id.* at 750–51.)

Although Defendants renew their *Batson* challenge, they offer no new arguments in their post-trial motion. Instead, Defendants reiterate an earlier argument that the Court should compare the stricken jurors to other jurors on the venire. In particular, one juror not stricken by the Government expressed a concern about government surveillance in the form of surveillance of cell phones and social media. (*Id.* at 49.) However, that juror also stated that she would tend to start off giving testimony from law enforcement officers a little more weight than that of other witnesses and that she could keep an open mind. (Tr. 50–51.) In sum, the "comparator" juror stated only general concerns about Government surveillance, while the stricken juror who heard the "This American Life" podcast raised a specific concern regarding tactics for infiltrating Muslim communities very similar to the tactics actually employed by the government agents in this case. Similarly, the juror who had personal experience with a friend who traveled to fight for ISIS was stricken not based on general feelings regarding the matters involved in this case but rather based on a specific, personal experience that bore a clear resemblance to things he would hear about at trial.

In the end, the Court stands by its prior ruling at trial that Defendants have failed to establish purposeful discrimination by the Government. To the contrary, the Court finds the Government's race neutral reasons for striking the two Black venire members offered by the Government to be reasonable. There was no *Batson* violation.

## II.     Judgment of Acquittal Based on Entrapment Defense

Defendants also seek judgments of acquittal under Rule 29. In so doing, Defendants do not argue that the Government failed to prove the elements of the charged crimes; instead, they

contend that the Government failed to meet its burden of rebutting their entrapment defense. "Entrapment is a defense to criminal liability when the defendant was not predisposed to commit the charged crime before the intervention of the government's agents and the government's conduct induced him to commit it." *United States v. Mayfield*, 771 F.3d 417, 420 (7th Cir. 2014). The entrapment defense consists of two elements: (1) lack of predisposition and (2) government inducement. See *id.* "[T]he two elements of the entrapment defense are formally distinct but related in the sense that inducement is evidence bearing on predisposition: the greater the inducement, the weaker the inference that in yielding to it the defendant demonstrated that he was predisposed to commit the crime in question." *Id.* at 430 (internal quotation marks omitted). Entrapment is "a fact question for the jury to decide 'as part of its function of determining the guilt or innocence of the accused.'" *Id.* at 439 (quoting *Sherman v. United States*, 356 U.S. 369, 377 (1958)). At trial, the prosecution bears the burden of proving beyond a reasonable doubt that the defendant was predisposed to commit the criminal act before he was approached by government agents, or that the defendant was not induced to commit the crime. *Id.*

### A.     Predisposition

The Government may rebut entrapment by proving that the defendant was predisposed to commit the crime. *See Mayfield*, 771 F.3d at 428. To demonstrate predisposition here, the Government must show that Defendants were "ready and willing to [commit the charged crime] and likely would have committed it without the [G]overnment's intervention, or actively wanted to but hadn't yet found the means." *Id.* at 438. The Government must further demonstrate that this predisposition existed "prior to the [G]overnment's attempts to persuade [Defendants] to commit the crime." *Id.* at 436. Nevertheless, Defendants' conduct after they encountered government agents may be relevant to their predisposition; this kind of indirect proof is often

important because direct evidence of belief and intent is often unavailable. *Id.* at 437. A defendant has not been entrapped merely because they lacked the means to commit a crime until the government provided them; however, there must be some likelihood that the person would have gone on to commit the crime even if the government had not intervened. *United States v. Hollingsworth*, 27 F.3d 1196, 1202–03 (7th Cir. 1994). The Court evaluates several non-exhaustive factors in considering predisposition: "the defendant's character or reputation; whether the crime was originally suggested by the government; whether the defendant engaged in criminal conduct for profit; whether there was evidence that the defendant was reluctant to commit the crime; and the nature of the government's persuasion." *United States v. Chapman*, 804 F.3d 895, 903 (7th Cir. 2015) (citation omitted).

### 1.   Defendant Jones

Turning first to Jones, he clearly supported ISIS, talked to others about ISIS, and was excited to receive ISIS propaganda and materials. He eagerly received an ISIS flag from an undercover agent, taking it to an Illinois beach to photograph himself with it. (Tr. 1776–78.) He also shared ISIS propaganda with others, including the video Flames of War, which is a recruitment video targeted at western audiences. (Tr. 93, 97, 2516–17.) He posted an ISIS execution video on his Google Plus page and sent it to an undercover agent. (Tr. 2527–29.) And he shared ISIS propaganda with a member of his mosque. (Tr. 770–75.) Jones testified that he was supportive of ISIS and that he had thought about moving to Syria or Iraq to live in the Islamic State. (Tr. 2512, 2524–25.)

On the other hand, there is no evidence in the record that Jones ever tried to provide material support to terrorist organizations or engage in any kind of politically or religiously motivated violence prior to the Government's involvement. He also did not engage in the crime

for profit. Early on, Jones demonstrated reluctance to provide material support to ISIS. For example, in an early text conversation with Omar, Jones discussed the frustrations of living as a Muslim in America and stated that he felt ready to leave the country, but he was not ready to go because he was worried about his family and was not sure if it was the right thing to do. (Tr. 563.) As Omar "traveled" to fight for ISIS, he wrote to Jones, "I wish you were taking this journey with me too. However, I trust in the plans that Allah has made for all of us. We may not be leaving together, but I feel we will be together at the end of the day because brother Bilal has a safe and secure way for us meeting again." (Tr. 577.) Similarly, Bilal introduced the idea to Jones that, as an ISIS facilitator, he could obtain money to allow Jones to take action in support of ISIS, but Jones never acted on that possibility. (Tr. 1128.) Government agents further suggested that Jones "rock it out," which could be interpreted as performing a violent attack. (Tr. 483.) But Jones never took any steps to carry out a violent attack. In short, Jones has presented substantial evidence that he was reluctant to provide material support to ISIS, considering how long the FBI's agents worked him and the multiple angles they took in giving him opportunities to act in support of terrorism.

Further, because predisposition "is chiefly probabilistic, not psychological"—dealing with the likelihood that a person would have actually committed the crime they were charged with—the absence of evidence that Jones engaged with actual ISIS members is relevant to his predisposition. *Mayfield*, 771 F.3d at 428. And here, the Government presented no evidence that Jones ever interacted with anyone actually affiliated with ISIS, although Jones interacted online with someone named "Nazeer Khannk," who asked Jones if he had pledged allegiance to ISIS (Jones responded that he had not) and asked if he was interested in traveling to the Islamic State. (Tr. 2514.)

Yet the Court must weigh whether a reasonable jury could have found that Jones had a predisposition to provide material support to a terrorist organization. The Court finds that it could. The evidence that could have persuaded a reasonable jury that Jones was predisposed to support ISIS includes his displaying of an ISIS flag and sharing of ISIS propaganda. His eager response to the ISIS flag is also relevant here. More broadly, the record shows that Jones sought interaction with other ISIS supporters online and attempted to connect with people who shared his beliefs. While those activities may have been protected speech and association under the First Amendment, *see Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*, 291 F.3d 1000, 1026 (7th Cir. 2002) ("[Defendants] may, with impunity, become members of Hamas, praise Hamas for its use of terrorism, and vigorously advocate the goals and philosophies of Hamas. Section 2339B prohibits only the provision of material support . . . to a terrorist organization."), the jury could consider those actions as evidence of Jones's state of mind.[5]

There was sufficient evidence in the record for the jury to conclude that Jones was interested in becoming involved in the secret world of ISIS facilitators that the FBI manufactured. He maintained a relationship with his new friends, even as it became clear that they were involved in providing support for ISIS. And ultimately, he decided to use the network that he believed to exist to provide support to ISIS. Reviewing the evidence in the light most favorable to the Government and drawing reasonable inferences in the Government's favor, as required under Rule 29, the Court concludes that a reasonable jury could have found that Jones was predisposed to provide material support for terrorism.

---

[5] And indeed, the jury was instructed that Defendants could not be convicted of a crime based only on their beliefs, expressions of those beliefs, or associations, but that their speech could be considered to establish the elements of an offense or their motives or intents. (Jury Instr. at 36, Dkt. No. 189.)

## 2. Defendant Schimenti

The Court next considers the evidence of Schimenti's predisposition. Similar to Jones, Schimenti frequently shared ISIS propaganda videos and posted comments supportive of ISIS on Google Plus. He also conversed with family members, a member of his mosque, and his then-girlfriend in support of ISIS. (Tr. 773–79, 830–31, 2191, 2197–2200.) His former girlfriend testified at trial that Schimenti discussed his desire to travel abroad to fight for ISIS on a weekly basis. (Tr. 845.) Jones testified that Schimenti expressed an interest in traveling to join ISIS (although Jones also testified that Schimenti "wasn't serious about that"). (Tr. 2574.) Perhaps most alarmingly, both Schimenti's former girlfriend and Jones testified that Schimenti expressed an interest in attacking the Great Lakes Naval Base. (Tr. 842–45, 2573–74.) Considering that Schimenti expressed a desire to attack a naval base and to travel to support ISIS, combined with his enthusiastic support for ISIS, a reasonable jury could have found that Schimenti was predisposed to provide material support to a terrorist organization.[6]

## B. Inducement

The Government can also rebut the entrapment defense by showing that Defendants were not induced to commit the crime. Inducement "means government solicitation of the crime plus some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts." *Mayfield*, 771 F.3d at 434–35. "Other government conduct" may include "repeated attempts at persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward beyond that inherent in the customary execution of the crime, pleas based on need, sympathy, or friendship."

---

[6] For the same reasons, a reasonable jury could have found that Schimenti was predisposed to knowingly make materially false statements to the FBI involving international terrorism. Although in his post-trial motion, Schimenti does not develop the argument that he was entitled to a judgment of acquittal on Count Two, the Court addresses the issue for the sake of completeness.

*Id.* at 435. Inducement also encompasses "any other conduct by government agents that creates a risk that a person who otherwise would not commit the crime if left alone will do so in response to the government's efforts." *Id.* However, that "government agents initiated contact with the defendant, suggested the crime, or furnished the ordinary opportunity to commit it is insufficient to show inducement." *Id.* at 434.

### 1.      Defendant Jones

The Court notes several examples in the evidentiary record where the Government initiated and sustained extensive contacts with Jones, including the development of several (fake) friendships. Omar, the first undercover agent planted by the FBI, posed as a victim of police discrimination and harassment. (Tr. 320–21.) Omar 2, who met Jones online, commiserated with Jones regarding anti-Muslim "harassment" against Schimenti and told Jones that, as a Black Muslim who faces discrimination in Chicago, he would be welcomed by Islam. (Tr. 943, 947–48.) Omar 2 further told Jones, "It doesn't matter what race you are. It is the belonging that really matters. And in our case, our identity is Islam and alhamdulillah for that." (Tr. 930–31.) Ultimately, Jones viewed Muhamed's entrance into his life as the final sign that God wanted him to act in support of ISIS. On this point, Jones testified at trial that the FBI placed, "four or five people . . . trying to get me to provide some form of material support to ISIS in different ways." (Tr. 2340.) Jones also testified that he was coerced into this scheme from the beginning, when the Zion Police Department threatened to arrest him if he did not come in for questioning, setting him up to be introduced to Omar. (Tr. 2343–44.)

At the same time, however, a reasonable jury could find the Government's evidence to be consistent with a different narrative. Jones testified that he voluntarily spoke to the police officers at the Zion Police Department and that he was free to leave. (Tr. 2348–49.) Carnright,

like the FBI agents, testified that the goal of their interactions with Jones was to "identify the individual's true intent and understand what they truly want to do." (Tr. 320–21.) A reasonable jury could have inferred that the FBI agents did not persuade Jones to commit a crime but instead "mirrored" his communications. (Tr. 537–38, 695–99.) After all, the FBI agents were careful not to directly ask Jones to do anything, and Jones was introduced to Bilal only after asking Omar if there were brothers he could "learn and build with." (Tr. 325–29.) Further, when Jones gave cell phones to Muhamed to be used for bombs, he said "I hope it kills many of them" or "eight people." (Tr. 1784.) Jones also testified before the grand jury that he chose to provide cell phones to Muhamed and to introduce Muhamed to Bilal, and was not pressured or forced to do so. (Tr. 1799–1800.) Jones further testified that he knew that engaging with or providing support to ISIS was against the law. (Tr. 1800.)

The Court must review the evidence in the light most favorable to the Government and make all reasonable inferences in the Government's favor. Doing so, the Court concludes that a reasonable jury could have found that Jones was not induced to commit the crime. Ultimately, "[e]ach case, and each entrapment defense, must be judged on its own facts." *United States v. Barta*, 776 F.3d 931, 938 (7th Cir. 2014). Here, the jury had the opportunity to judge the facts; Jones's defense team argued vigorously to the jury that the FBI crossed a line in its interactions with Jones; the jury rejected that argument.

## 2. Defendant Schimenti

Turning next to Schimenti, he also points to evidence in the record that the FBI exploited his loneliness and vulnerability for the purpose of inducing him to act. The record shows that Muhamed formed a friendship with Schimenti, at one point even telling Schimenti that he was a "gift from god," the one good thing about Muhamed's life in America. (Tr. 1473.) Further, Bilal

told Schimenti that he was "ready to explode" for the sake of Allah; Bilal testified at trial that the meaning of this was to act in a jihadi context. (Tr. 1163–65.) On the other hand, the record contains evidence that Muhamed did not ask Schimenti to bring him phones. (Tr. 1242, 1313, 1345, 1388–90.) Instead, he told Schimenti that his brother had asked him (that is, Muhamed) for phones. The record contains evidence that Schimenti volunteered to take the actions to provide support to a terrorist organization. (*E.g.* Tr. 1308, 1313, 135.) Again reviewing the evidence in the light most favorable to the Government, a reasonable jury could have found that Schimenti was not induced to provide material support for terrorism.[7]

### III.   New Trial Based on Belated Disclosure of Witness Payments

Defendants also ask this Court to grant them a new trial under Rule 33 based on the discovery post-trial that Carnright's trial testimony regarding the FBI's pre-trial payments to Muhamed was misleading (if not actually false) and that after the trial, the Government paid Muhamed $50,000 for his assistance.

On October 23, 2019, the Government for the first time disclosed to Defendants that the FBI paid Muhamed $50,000 following the jury's guilty verdict. (Defs.' Mot. to Continue Post-Trial Mots. ¶ 2, Dkt. No. 231.) The revelation was made by e-mail, just two days before Defendants were due to file briefs in support of their post-trial motions. The Government's email disclosure to Defendants' counsel did not include any information about the payment other than the amount and that it had been made after the guilty verdict. Accordingly, Defendants filed a motion asking the Court to require additional discovery from the Government regarding the

---

[7] Similarly, to extent Schimenti's Rule 29 motion is directed to Count Two, a reasonable jury could have concluded that Schimenti was not induced to knowingly make materially false statements involving international terrorism to the FBI. The record does not indicate that Schimenti was pressured, pushed, or otherwise coerced into making such false statements; during that interview, he knew that the FBI agents were FBI agents and chose to lie to them.

FBI's payments to Muhamed and to hold an evidentiary hearing to develop a record for purposes of post-trial motions and any additional relief that may be necessary. The Court granted the request.

In response to the Court's order, the Government initially filed a sworn affidavit from Carnright. In her affidavit, Carnright attested that "[her] intention to pay Muhamed was notional until officially requested and concurred upon by FBI Management," which did not happen until after the trial was complete. (Carnright Aff. ¶ 4.) She further stated that, "[a]t no time during the investigation, to include the trial, did [she] ever submit a request for payment nor did [she] discuss with FBI Chicago or with FBI Headquarters how much money [she] would ultimately request to pay Muhamed." (*Id.*) However, Carnright admitted that she had a conversation prior to trial with an Assistant United States Attorney working on the case, during which she raised the possibility of paying Muhamed and that the attorney advised her "to wait until after the resolution of the case."[8] (*Id.*) According to Carnright, Muhamed was not informed until after the trial that he would be compensated financially for his participation in the investigation; instead, he "was given exact reimbursement for expenses incurred at the request of the FBI." (*Id.* ¶¶ 7–8.)

At the evidentiary hearing on December 2, 2019, Carnright, who was the sole witness, provided additional testimony regarding approximately $16,000 that the FBI paid Muhamed prior to trial as well as the $50,000 post-trial payment. Prior to trial, the Government disclosed that the FBI had made payments to Muhamed; at the hearing, defense counsel acknowledged that they previously could have, but did not, seek a breakdown of these expenses. (Show Cause Hr'g

---

[8] At the subsequent evidentiary hearing, Carnright clarified that she was advised by the Assistant United States Attorney not to compensate Muhamed for his participation in the investigation until after the trial, and that she made this inquiry around early 2017—before Jones and Schimenti were arrested. (Show Cause Hr'g Tr. 30–31.)

Tr. 23–24.) Carnright, testifying under oath, revealed that the pre-trial payments to Muhamed included a $8,680 relocation "stipend" that was not tied to any reimbursement for specific expenses but instead was intended to allow Muhamed to relocate apartments. (*Id.* at 25–26, 34.) She also testified that Muhamed never asked her for money, she took no steps before the end of trial to get approval for the $50,000 payment, and she never told Muhamed that he would be paid further for his work. (*Id.* at 45–47.) Carnright claimed that she came up with the amount of the payment but needed to submit a request to her supervisors to get the payment approved. (*Id.* at 31–32.)

That was not the end of the Government's belated disclosures. Following the evidentiary hearing, the Government produced an "expense tracker" prepared by Carnright and itemizing the dates and amounts of the payments to Muhamed. The expense tracker appears to show that Muhamed's stipend included, among other things, a down payment of $1,200 for a car, three car payments of $400 each, a security deposit of $925, payments for three months of rent totaling $2,775, and a month's worth of "per diem" expenses totaling $2,130. (Jones's Post-Trial Mot., Ex. 2, Expense Tracker, Dkt. No. 249-2.) The spreadsheet also reflects $5,575 for "amount service" prior to trial—the same category used for the $50,000 post-trial payment and not attributable to any specific reimbursement. (*Id.*)

The Court finds the Government's belated and at times contradictory disclosures regarding the FBI's payments to Muhamed troubling. At trial, Carnright told the jury that Muhamed's post-investigation expenses were "for him to move his residence." (Tr. 412.) But she did not mention that the FBI had subsidized three months of rent or helped Muhamed buy a second car. Furthermore, at trial, Carnright testified that the FBI did not pay Muhamed for working with them. (Tr. 410.) Instead, according to Carnright, the FBI merely gave Muhamed

some money "to afford for any costs incurred to him throughout the course of the investigation." (Tr. 410–11.) And of course, she never mentioned any intention to pay Muhamed for his services after the trial was complete.

Furthermore, Carnright initially testified at trial that the FBI's payments to Muhamed reflected reimbursements for expenses. In her post-trial affidavit, she did not budge on this point, stating that, prior to the $50,000 post-trial payment, "Muhamed was given exact reimbursement for expenses incurred at the request of the FBI as previously disclosed to the Court." (Carnright Aff. ¶ 8.) But Carnright's testimony at the post-trial evidentiary hearing and the belatedly produced expense tracker suggest that her prior testimony was not entirely accurate. In fact, Muhamed was given around $8,600 in a lump-sum payment, which consisted of a month of per diem payments, payments for the purchase and financing of a second car, and three months of rent.

The post-trial revelations regarding payments to Muhamed also implicate his testimony at trial that the Government gave him money "only for fuel, car—I mean, not fancy car, just cheap car—for parking, for moving out from my old apartment after the case." (Tr. 1226.) Muhamed further testified that he had not asked the FBI for anything in exchange for his cooperation, they had not offered him anything, and he did not expect to get anything. (Tr. 1225.) But Defendants would argue that the circumstances surrounding the $8,600 lump sum payment that Muhamed received and other unaccounted-for expenses in Carnright's expense tracker suggest that perhaps he did have a reason to believe that he would be paid following a guilty verdict. Further, the Court considered giving a "caution and great care" jury instruction about witnesses who receive benefits connected to their testimony. The Court might have reached a different conclusion regarding the propriety of such an instruction, if it had complete information regarding the nature

of the pretrial stipend that Muhamed received and Carnright's intention to pay Muhamed following the trial.

The question is whether Defendants are entitled to a new trial based on the post-trial revelations. When a Rule 33 motion is based on newly discovered evidence, the defendants "must demonstrate that the evidence '(1) came to their knowledge only after trial; (2) could not have been discovered sooner had due diligence been exercised; (3) is material and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a retrial.'" *United States v. Eads*, 729 F.3d 769, 780 (7th Cir. 2013).

As an initial matter, the $50,000 payment itself does not constitute newly discovered evidence because it had not occurred at the time of trial. Evidence that did not exist until after the trial does not "constitute evidence upon which a new trial could be based." *United States v. Bolden*, 355 F.2d 453, 461 (7th Cir. 1965). A jury commits no error by failing to consider evidence that is not yet in existence. *See United States v. Hall*, 324 F.3d 720, 723 (D.C. Cir. 2003) ("[e]vents and transactions occurring after the trial obviously could not have been the subject of testimony at the trial."). Despite Defendants' suggestion that the $50,000 payment was a foregone conclusion before Muhamed testified and that it strains credulity that Muhamed would not have known about the plan to pay him, the Court cannot reach that conclusion based on the record before it. Muhamed had not received the $50,000 payment prior to the conclusion of the trial, nor is there any evidence of an express agreement between Muhamed and the FBI that he would be paid. Indeed, the Court finds the most likely scenario to have been that Carnright intentionally avoided any mention of a potential post-trial payment to Muhamed so that it would not have to be disclosed to defense counsel.

That leaves the evidence of Carnright's intention to seek a $50,000 payment for Muhamed and the details of the $16,000 in pre-trial payments. Defendants contend that Carnright's plan to pay Muhamed $50,000 came to their attention only after trial and could not have been discovered sooner using due diligence. The Court agrees. The Government represented prior to trial that it would provide Defendants with information regarding "any benefits exclusive of employment benefits, that the witnesses may have received for this participation in this investigation." (Gov't Reply to Def.'s Objs. to Protective Order at 2, Dkt. No. 116.) But the Government did not provide Defendants with information regarding Carnright's inquiry about paying Muhamed or disclose that Muhamed had received pre-trial payments that arguably went beyond mere reimbursements. Thus, the Court concludes that Defendants have established that the plans to request a $50,000 payment for Muhamed and the circumstances around it (including the breakdown of the $16,000 payment) came to Defendants' awareness only after trial and could not have been discovered using due diligence, particularly given the Government's assurances that it would disclose information relevant to benefits that the witnesses "may have received."[9]

The Court next considers whether this newly discovered evidence, if available at trial, would have been material or merely impeaching or cumulative. The payments to Muhamed arguably implicate Carnright's and Muhamed's credibility, but not of the ultimate question of Defendants' guilt or innocence. If known, the evidence might have given the jury reason to

---

[9] The Government suggests that because the payments to Muhamed before trial were not benefits and Carnright never told Muhamed to expect future benefits, the Government did not err in failing to disclose the information. This Court disagrees. Of course, whether the information would have been admitted into evidence is a matter separate from whether it should have been disclosed to the defense. The Court can imagine arguments for at least some of the information to be excluded. But the Court never got the chance to consider the propriety of allowing the jury to hear the details of the pretrial payments or Carnright's plans for a post-trial payment.

question whether Muhamed had a financial motive for his actions. This, in turn, might have caused members of the jury to view Muhamed's testimony with greater skepticism. But Defendants have not identified any particular testimony given by Muhamed that they claim was exaggerated or outright false—other than his motives for testifying. Given that the jury did hear evidence regarding pretrial payments to Muhamed, even if some of the detail may have been omitted to inaccurate, and the speculative nature at least at the time of trial, of any post-trial request for payment to Muhamed, the Court cannot conclude that the additional information would have been material and not cumulative.

Notably, this is not a case whether the parties presented competing testimony about what Muhamed said or did and was asked to determine which witness was telling the truth. Instead, most of the interactions between Muhamed and Defendants were recorded and played for the jury so that the jurors could interpret the events themselves. Defendants rely on Muhamed's testimony that he did not ask Defendants to do anything and avoided injecting certain topics into their conversations, his description of the "many" conversations that were not recorded, and the overall extent of the Government's alleged entrapment scheme. But the jury did not need to rely on Carnright's or Muhamed's descriptions of what happened between the government agents and Muhamed, on the one hand, and Jones and Schimenti, on the other hand, to determine whether Defendants were entrapped. Instead, they could listen to and watch recordings of nearly every important interaction at issue in this case themselves. The jury even heard directly from Jones, who testified about many of the same events as the Government witnesses. Having reviewed this evidence, the jury found that neither Defendant was entrapped. As discussed above, there were ample facts in the record from which the jury could reach that conclusion. Defendants were able

to put on a substantial entrapment defense without the withheld evidence; the jury weighed Defendants' arguments and found against them.

Defendants' argument also fails because the Court cannot find that the newly discovered evidence would probably lead to an acquittal in the event of a retrial. The newly discovered evidence might weaken the Government's case and complicate their narrative that Muhamed participated in the investigation based solely on his patriotism. But it does not rise to the level of probable acquittal. The Court notes that the jury did hear evidence calling into question the purity of Muhamed's motives for participating in the FBI investigation. At the time of the investigation, Muhamed was a legal refugee with permission to work; he became a legal permanent resident only after he started working with the FBI. (Tr. 405–06.) Carnright testified at trial that the FBI helped Muhamed with his green card application—Muhamed asked the FBI why his application was taking so long, and the FBI inquired with the Department of Homeland Security. (Tr. 407.) Carnright further testified that the Department of Homeland Security had "misinformation" that Muhamed was a member or supporter of ISIS (which the FBI corrected) and that Muhamed's fingerprints were registered with the Department of Defense, delaying his immigration application (which the FBI helped to resolve.) (Tr. 407–08.) And the FBI arranged for a United States customs officer to come to a meeting where Muhamed was present to confirm to Muhamed that his application was being processed and was on the right track. (Tr. 1758–62.) In light of this substantial evidence tending to impeach Muhamed's motives regarding the investigation, the Court finds it even less likely that testimony regarding the possibility of a financial reward would have swayed the jury's decision.

Rule 33 motions are properly granted only in "the most extreme cases." *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998) (internal quotation marks omitted). The newly

discovered evidence in this case may cast the Government in a poor light, but this is not such an extreme case that a new trial is justified.

**IV.      Defendants' Remaining Challenges**

Defendants raise several additional arguments in their post-trial motions. First, they argue that the Court wrongfully granted the Government's motion for a protective order, which they claim prevented the defense from "asking any questions about the witnesses' participation in past or pending investigations or undercover operations" and "asking any questions regarding any FBI undercover program." (Gov't Mot. for Protective Order at 6, Dkt. No. 104; Order on Mot. for Protective Order, Dkt. No. 121.) Defendants contend that this protective order was wrongly granted because it prevented them from adequately investigating and cross-examining witnesses. However, the Court may impose "reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

This case was a terrorism-related criminal matter that received significant media coverage. FBI Assistant Director for Counterterrorism Michael C. McGarrity filed a classified declaration describing the risks witnesses would face if their identities were disclosed. Similarly, unnecessarily disclosing information regarding the FBI's undercover programs could endanger agents involved in other investigations. Defendants protest that such a threat "must be actual and not a result of conjecture" to form the basis for a protective order. *United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969). But the Court finds that the Government met this standard here. Further, Defendants do not compellingly argue that the protective order impeded them from obtaining material information about the alleged benefits Muhamed received for his participation

30

in the FBI investigation. To the contrary, the Government specifically acknowledged that it *would* produce any such information notwithstanding the entry of the protective order.

Defendants also contend that they should have been allowed to call additional FBI investigators to the witness stand to examine them regarding their opinions on the merits of the investigation. Discovery produced to Defendants indicated that certain FBI agents may have expressed frustration among themselves because Defendants were slow to engage in criminal acts in support of terrorism (or so Defendants would have argued). One agent, for example, characterized a meeting with Jones as "[b]eating the dead horse known as Jones." (Tr. 654.) However, the agent's personal opinion of whether continued investigation of Jones would bear fruit does not speak to the guilt or innocence of Jones or Schimenti, and would have carried the risk of confusing the jury. Accordingly, the Court properly excluded the evidence.

Finally, Defendants contend that the cumulative effect of trial errors deprived them of their right to a fair trial, but they do not elaborate on this argument. The Court does not find that any alleged errors, considered individually or together, require a new trial. Each Defendant further states that they incorporate, assert and preserve the pleadings and motions, written and oral, made before, during, and after trial by their codefendant. The Court evaluates their post-trial motions as jointly made and adopted, but will not revisit every argument that Defendants made before, during, and after trial. It is Defendants' responsibility to specifically and substantively raise the issues that they ask this Court to decide.

**CONCLUSION**

For the above reasons, Defendants' motions for judgment of acquittal or, alternatively, a new trial (Dkt. Nos. 248, 249) are denied.

ENTERED:

Dated:  February 18, 2021

Andrea R. Wood
United States District Judge